Thomas C. POLLGREEN, Floyd E. Roseman, Roberto Hernandez, Abelardo Vazquez, Plaintiffs,

v.

Raymond A. MORRIS, District Director of United States Immigration and Naturalization Service; Durward E. Powell, Regional Commissioner of United States Immigration and Naturalization Service; Douglas D. Angle, District Director of the United States Customs Service; Robert N. Battard, Regional Commissioner of the United States Customs Service, Defendants.

John FERNANDEZ, Sr., Larry Foltz, Phillip D. Pierce, Rodolfo Rego, David Trujillo, John Montague, Jessie Marvin Hickman, Giddis Earl Hodges, Joseph D. Weed, Carolyn J. Knowles, Douglas J. Clark, Frank S. Stalls, Oliver J. McQuaig, Larry Foltz as Personal Representative of H. E. Morgan Estate, Larry Foltz as manager of certain shrimping vessel, Plaintiffs,

v.

Raymond A. MORRIS, District Director of United States Immigration and Naturalization Service; Durward E. Powell, Regional Commissioner of United States Immigration and Naturalization Service; Douglas D. Angle, District Director of the United States Customs Service; Robert N. Battard, Regional Commissioner of the United States Customs Service, Defendants.

Nos. 80–1412–Civ–SMA, 80–1414–Civ–SMA.

United States District Court, S. D. Florida, Miami Division.

June 25, 1980.

As Modified July 7, 1980.

Diane R. Tolbert, Key West, Fla., for plaintiffs in No. 80–1412–Civ–SMA.

Thomas J. Sireci, Jr., Key West, Fla., for plaintiffs in No. 80–1414–Civ–SMA.

Atlee W. Wampler, III, U. S. Atty., So. Dist. of Florida, by Robert I. Targ, Asst. U. S. Atty., Miami, Fla., Lauri Steven Filppu, Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION AND PRELIMINARY INJUNCTION

ARONOVITZ, District Judge.

The issues before the Court today arise from the seizure of 31 vessels, owned by 19 American citizens, which were used in the April through June, 1980 "Cuban Refugee Freedom Flotilla." Specifically, Plaintiffs' request for preliminary injunctive relief raises two related questions. First, whether the Government impermissibly denied the boat owners a prompt post-seizure hearing in derogation of the due process provi-

sions of the Fifth Amendment and, second, whether the vessels in question were not properly subject to seizure because, at the time of the alleged illegal act, the owner or other person in charge of the vessel was acting under duress. These questions emerge here from the following series of extraordinary events.

In early April, 1980, Cuban citizens numbering in excess of 10,800, who maintained that they were political refugees, sought sanctuary in the Peruvian Embassy in Havana. Recognizing "that special circumstances exist[ed]," President Jimmy Carter on April 14, 1980, determined that those persons in the Peruvian Embassy "who otherwise qualify may be considered *refugees* even though they are within their country of nationality or habitual residence." Further, declaring "that an unforeseen emergency *refugee* situation exists" President Carter concluded that "grave humanitarian needs" and the "national interest" justified the admission of up to 3500 of the refugees to this country and the appropriation of up to $4.25 million to aid in their resettlement pursuant to the Refugee Act of 1980.[1] 45 Fed.Reg. 28079 (April 14, 1980). Through diplomatic efforts, an airlift was arranged to carry the Peruvian Embassy refugees from Havana to San Jose, Costa Rica. Once there, the refugees were to be processed for resettlement in the United States, Costa Rica, Peru and other Latin-American countries. After three days, the Cuban government halted the refugee flights. Whether cancellation of the flights acted as the catalyst is unclear from the record before the Court, but on April 19, 1980, small clusters of boats began to leave Key West, Florida for Mariel Harbor, Cuba to pick up refugees. The first boatloads returned from Mariel on April 21, foreshadowing the masses which followed—nearly 1800 boats carrying approximately 114,000 refugees.

The government maintains that from the outset of the "Freedom Flotilla" the public was warned that anyone traveling to Mariel to pick up refugees without valid visas would be subject to arrests and fines. Whether this position is substantiated by the record the Court need not say. Suffice it to note that whatever the government's enforcement posture was previously, President Carter raised serious questions on May 5, 1980, when asked what he intended to do "about enforcing current immigration laws." In response, the President promised "[w]e'll continue to provide an open heart and open arms to refugees seeking freedom from communist domination and from the economic deprivation brought about primarily by Fidel Castro and his government." ¶ 28 Plaintiffs' Complaint, p. 10.[2]

On May 14, 1980, the President took affirmative steps to end the "Freedom Flotilla" by imposing a blockade on outgoing vessels and ordering the return of U.S. vessels already at Mariel Harbor. The following message, broadcast over numerous radio frequencies, contained the essence of the President's policy:

All United States citizens in Cuban ports and enroute Cuba are advised to return to the United States at this time. The U.S. Government will arrange alternative transportation. Vessels not under charter or hire by the U.S. Government are subject to heavy fines and possible seizure if they transport Cuban citizens in violation of U.S. Immigration laws. All U.S. boats in Mariel and those enroute to Cuba are advised to return to the United States without delay.

The flow of vessels and refugees returning from Mariel eventually began to decline and now has diminished to a trickle.

These consolidated actions[3] were brought by 19 Plaintiffs who are owners, managing

1. The Refugee Act of 1980 was enacted as Pub.L. 96–212 (March 17, 1980), reprinted in 1980 U.S.Code Cong. & Admin.News at 94 Stat. 102.

2. Testimony adduced before the Court revealed the broad press coverage this statement re-

ceived, and its profound effect upon the Cuban-American community.

3. Upon examination, the Court has determined that the Plaintiffs' individual claims may not lend themselves to treatment on a consolidated basis for trial. However, because of the neces-

agents or captains of 31 vessels which participated in the "Freedom Flotilla," transporting various numbers of Cuban refugees from Mariel to Key West.[4] The record reveals that the majority, if not all of the vessels received prior "clearance"[5] from Customs officials to travel to Mariel. Upon return of the vessels to Key West, however, each Plaintiff was served with a Notice of Intention to Fine Under Immigration and Nationality Act. See Plaintiffs' Ex. # 3. The notices specifically referenced potential liability under 8 U.S.C. §§ 1321, 1323 and 1324. Further, Plaintiffs' vessels were seized by the U.S. Customs Service and U.S. Immigration and Naturalization Service,[6] and the owner, master or captain of each vessel signed an "Agreement and Notice" to that effect.[7] See Government's Exhibit # 4. This "Agreement and Notice" also references potential liability and the possibility of forfeiture for violations of 8 U.S.C. §§ 1321–1325, as well as numerous other statutes.

On or about June 4, 1980, Plaintiffs demanded return of their vessels or, alternatively, that they be permitted to avail themselves of the administrative mechanisms set forth in 8 C.F.R. Part 274 which provide for the expeditious return to the owner of vessels improperly seized under 8 U.S.C. § 1324. Representatives of the Customs Service and the Immigration and Naturalization Service advised Plaintiffs that the vessels would not be returned at that time, that the administrative mechanisms set forth in 8 C.F.R. Part 274 were unavailable, and that Plaintiffs' recourse was to challenge the imposition of the fines under 8 C.F.R. Part 280.

Asserting jurisdiction under 28 U.S.C. §§ 1331, 1355 and 1356 and alleging deprivation of their due process rights secured under the Fifth Amendment to the U.S. Constitution, Plaintiffs filed this action against Defendants Morris and Powell of the Immigration and Naturalization Service and Angle and Battard of Customs Service. Plaintiffs seek a declaration that the vessel seizures were unlawful and an injunction permanently enjoining Defendants from seizing the 31 vessels or seeking to levy any fines under 8 U.S.C. §§ 1321, 1323 and 1324.

On June 16, 1980, a full-day evidentiary hearing was held on Plaintiffs' request for preliminary injunctive relief. The sole relief Plaintiffs seek by preliminary injunction is the return of their vessels for normal commercial fishing use. The issues raised by Plaintiffs were briefed and argued. In addition, the Court received testimony, exhibits and affidavits submitted by the parties. The Court has carefully considered the entire record from the June 16 proceedings and herein makes its findings of fact and conclusions of law as required by Fed. R.Civ.P. 52. For the reasons which follow, the Court today enters a preliminary in-

---

sity for expeditious treatment of the motions for preliminary injunction, and inasmuch as the complaints were substantially identical, these individual actions were consolidated for the initial purpose of ruling on the requests for preliminary injunctive relief and pre-trial proceedings.

**4.** All 19 Plaintiffs are American citizens who engage in commercial fishing and shrimping. A review of the Complaint and testimony adduced before the Court revealed Plaintiffs are long-time residents of Key West who own their own homes and have familial and other strong ties to the local community.

**5.** "Clearance" constitutes the right of a vessel to leave port to travel to a foreign port and is evidenced by an executed Certificate (Customs Form 1378) from the District Director of Customs. See 19 C.F.R. § 4.61.

**6.** Seizures commenced as early as April 26, 1980.

**7.** The process by which the vessels were seized was ad hoc in nature, there being no statutory or regulatory authority for the seizure procedure employed. Essentially, the "Agreement and Notice" created a "constructive" seizure, whereby the "owner/operator/master" retained the vessel in his "care and custody, for the sole purpose of maintaining and safeguarding" the craft. Evidently this arrangement served two purposes: minimization of storage costs and maximization of upkeep by the owner, thereby reducing the potential for damage. The agreement also bars the use of the vessel, establishes other prohibitions and informs a signatory that failure to abide by its terms "will lead to criminal prosecution under Title 18 U.S.C. § 2232."

junction, the contours of which are set forth in detail below.

The Court is, of course, aware of the controversy surrounding the Cuban Freedom Flotilla and the substantial problems it has created for this country and, in particular, South Florida. We hasten to add, however, that the decision here neither reflects approval of Plaintiffs' participation in the Freedom Flotilla nor criticism of the Government's decision to fine or prosecute Plaintiffs for their participation. At root, the controversy here reflects a basic contradiction between, on the one hand, America's tradition of providing sanctuary for the homeless, the outcast and, particularly, the political refugee and, on the other, our immigration laws. That tension finds expression in the discomfiting question of who, and how many, can come to this country and in what circumstances. Resolution of that tension through promulgation and enforcement of a *coherent* immigration policy is a matter within the province of the Legislative and Executive Branches of government. This Court has neither the willingness nor the competence to interject itself into the arena of immigration policy, except insofar as such a policy runs afoul of constitutional and statutory safeguards, as is the case here.

### (I)

In order to deal with the legal issues raised by the parties, it is necessary to understand the statutory and regulatory scheme in question. As indicated, Plaintiffs were served with notices of intention to fine for alleged violations of 8 U.S.C. §§ 1321, 1323 and 1324. Section 1321 imposes a duty upon vessel owners and operators not to bring an alien to a non-designated port-of-entry at a time or place other than as designated by Immigration Officers. Noncompliance results in assessment of a $1000 penalty, to be imposed in accordance with the promulgated regulations at 8 C.F.R. §§ 280.1, *et seq.* Under the statute, the penalty operates as a "lien upon the vessel. . . ." 8 U.S.C. § 1321(a).

The second pertinent statute, 8 U.S.C. § 1323, proscribes bringing into the United States any alien who does not have a required valid visa. Failure to comply renders persons violating the statute liable to a fine in the sum of $1000 per undocumented alien. In contrast with § 1321, § 1323 does not create a lien upon a vessel involved in bringing in undocumented aliens, but it does specify that such a vessel will be denied "clearance . . . pending the determination of the liability to the payment of such sums . . . except that clearance may be granted prior to the determination of such question upon the deposit . . . of a bond . . . ." 8 U.S.C. § 1323(b). Section 1323(c) provides, however, that the penalties may be "remitted or refunded" if the owner or operator "did not know and could not have ascertained by the exercise of reasonable diligence, that the individual transported was an alien and that a visa was required." 8 C.F.R. § 280.1, *et seq.* sets forth the framework for remission or mitigation of a fine under 8 U.S.C. § 1323.

The last statute, 8 U.S.C. § 1324, imposes a fine not to exceed $2,000.00 or a term of imprisonment not to exceed five years for any person who:

(a) brings into the United States an alien not lawfully entitled to enter;

(b) willfully or knowingly conceals or harbors an alien not lawfully entitled to enter; or

(c) willfully or knowingly encourages or induces the entry of an alien not lawfully entitled to enter.

Notably, the first act listed above is the same activity prohibited by § 1323. Section 1324 further provides that any vessel used in the commission of a violation is subject to seizure and forfeiture *except* when the owner "was not at the time of the alleged illegal act a *consenting* party or privy thereto . . . ." 8 U.S.C. § 1324 (b)(1)(A) (emphasis supplied). To protect owners from wrongful seizures, Congress directed the Attorney General to "promulgate regulations setting forth procedures for the *expeditious return to the owner* . . . of any vessel [improperly] seized" pursuant to § 1324(b). The required

regulations were promulgated on April 17, 1979, at 8 C.F.R. Part 274 (1980). They declare that the Regional Commissioner of the Immigration and Naturalization Service, a Defendant herein, is the *de jure* custodian of the seized vessels. 8 C.F.R. § 274.3. The regulations specifically provide the seizure may not be made of a vessel owned by an individual who was a non-consenting party to the illegal act. 8 C.F.R. § 274.4. The regulations further provide that an owner must be advised within 72 hours after service of notice of the seizure that he has the right to meet with an Immigration officer at which time he may present his evidence and argument that the vessel was improperly seized. 8 C.F.R. § 274.5(b). If the officer determines that the vessel was improperly seized "the conveyance *shall* be returned to the owner without any expenses. . . ." *Id.*

Although the Notices of Intention to Fine reference potential liability under 8 U.S.C. §§ 1321 and 1324, the Government maintains that it is the *in personam* fines of $1000 per undocumented alien imposed under 8 U.S.C. § 1323 "which establish the *primary basis* for the vessel seizures in issue here (emphasis added)."[8] Government's Brief, p. 5. While, as noted previously, 8 U.S.C. § 1323 expressly provides for denial of *clearance* to vessels involved in civil fine violations under the statute, it does not, unlike 8 U.S.C. § 1324, authorize the seizure of such a vessel. The Government contends, however, that seizure of Plaintiffs'

vessels was undertaken pursuant to a Customs Boarding Statute, 19 U.S.C. § 1581(e), which provides in pertinent part:

> If upon the examination of any vessel . . . it shall appear that a breach of the laws of the United States is being or has been committed so as to render such vessel . . . . liable to forfeiture or to *secure any fine or penalty*, the same shall be seized . . . . (emphasis added).

Further, inasmuch as Plaintiffs' vessels were seized under 19 U.S.C. § 1581(e) (the Customs Statute), the Government asserts that the administrative procedures set forth in 8 C.F.R. Part 274 (promulgated pursuant to an immigration statute, 8 U.S.C. § 1324(b)) are not available to challenge the seizure of the vessel and that, absent posting a bond,[9] Plaintiffs cannot secure release of their vessels during the pendency of any proceedings, administrative or judicial, involving the fines levied under 8 U.S.C. § 1323.

Plaintiffs' response is basically two-fold. First, they insist that where, as here, a governmental deprivation of a constitutionally protected property interest has taken place, due process safeguards are implicated. Inasmuch as Defendants, by their own admission, intend to fine Plaintiffs for alleged violations of 8 U.S.C. §§ 1321, 1323 and 1324, and since Defendants seized Plaintiffs' vessels to secure those fines, Plaintiffs contend it is disingenuous for the Government to deny them the procedural

---

**8.** The Court understands this to mean, and counsel for the Government verified during oral argument, that the Government does not preclude proceeding against Plaintiffs under either 8 U.S.C. §§ 1321 or 1324. The possibility that the Government might proceed against the Plaintiffs under 8 U.S.C. § 1321 or § 1324 is further illustrated by the "Agreement and Notice" issued by Customs and signed by each vessel owner. That document requires the owner to agree "not to move said vessel until a determination concerning the *penalties and/or forfeiture* of the vessel has been made." It further requires the owner to acknowledge "that the U.S. Customs Service is seizing this vessel for violation of Title 8, United States Code, Section [sic] 1321–1325 . . . ." and numerous other statutes. Government's Ex. 4 (emphasis added). To be sure, at the prelimi-

nary injunction proceedings it became clear the Government is also considering prosecution for alleged violations of either documentation or marine laws. Government's Brief, p. 3.

**9.** The Government's bonding procedures are set forth in Government's Ex. 5. Essentially, the procedures provide for the release of vessels upon the posting of bonds of $30,000 to $50,000, depending upon vessel size. It should be noted that government witnesses could not identify, with any particularity, the statutory or regulatory provision empowering the promulgation of the bonding procedures. Upon questioning by the Court concerning the arguable *ad hoc* nature of the bonding procedures, counsel for the Government suggested 19 C.F.R. § 113.1 authorized the procedures.

safeguards of post-seizure notice and hearing as contemplated by Congress in 8 U.S.C. § 1324(b)(1), simply because seizure was allegedly undertaken pursuant to 19 U.S.C. § 1581(e). Alternatively, Plaintiffs maintain that even if the notice and hearing requirements of 8 C.F.R. Part 274 do not technically apply in this case, some form of post-seizure procedural process was due.

Given such a hearing, Plaintiffs contend they would show no violations of 8 U.S.C. §§ 1321, 1323 and 1324 occurred. They maintain they went to Mariel intending to pick up refugees with valid visas but that armed Cuban officials, using threats of force, would not permit them to return to the United States and required them to overload their vessels with Cubans without the requisite visas. In short, Plaintiffs claim they acted under duress; therefore, seizure of their vessels was improper.

### (II)

▮ The due process clause of the Fifth Amendment[10] mandates procedural safeguards against governmental deprivation of an individual's property and liberty interests. *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). These procedural safeguards have their historical origins in the notion that conditions of personal freedom can be preserved only when there is some institutional check on arbitrary government action. The usual due process analysis is two-fold: determining whether a constitutionally protected property or liberty interest is at stake, and if so, then assessing the appropriate measure of procedural protection due. *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Here, 31 commercial fishing vessels, surely a form of constitutionally protectible property, were seized by government officials and, absent a bond, put totally beyond use during the pendency of administrative and judicial proceedings concerning fines that the government intends to impose for alleged violations of 8 U.S.C. §§ 1321, 1323 and 1324. The question before the Court, therefore, is whether due process strictures were satisfied.

▮ The right to due process is absolute; but what constitutes due process varies in different factual situations. *Mathews v. Eldridge*, 424 U.S. at 333–34, 96 S.Ct. at 901–903. There are basic elementary safeguards of procedural due process, which, although having varying forms in different contexts, must be present. The absence of some form of those basic protections is a fatal deficiency. *North Ga. Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 607, 95 S.Ct. 719, 722, 42 L.Ed.2d 751 (1975). The fundamental, indispensable protections of procedural due process are notice and a right to be heard by an impartial decision-maker, and both "must be granted at a meaningful time and in a meaningful manner." *Fuentes v. Shevin*, 407 U.S. 67, 80, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972), quoting from *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). Notice and a hearing are *ordinarily* required *prior* to government deprivations. Exceptions to this general rule have been made where a prior hearing would have been inconsistent with "a countervailing . . . interest of overriding significance," *Boddie v. Connecticut*, 401 U.S. 371, 377, 91 S.Ct. 780, 785, 28 L.Ed.2d 113 (1971), either because of the delays created by the hearing process, or because of the opportunity for evasion presented to the target of government action by the very fact of prior notice. Thus, the Supreme Court has not required a hearing prior to emergency action in wartime[11] nor has the Court compelled prior hearings where summary action has been necessary to protect consumers

---

10. The Fifth Amendment commands the federal government: "No person shall . . . be deprived of life, liberty, or property, without due process of law . . . ."

11. *See, e. g., Bowles v. Willingham*, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944) (upholding provisions of the Emergency Price Control Act of 1942, authorizing the Office of Price Administration to fix rents without first granting landlords a hearing).

from impure food [12] or misbranded drugs,[13] to secure effective tax collection,[14] to seize articles used in the commission of crimes,[15] to permit emergency bank management,[16] or to protect public institutions from serious disruption.[17]

▆▆▆ The considerations which justified postponement of notice and hearing in those cases are equally present here. First, seizure of the vessels fostered the public interest in preventing their continued use in the "Freedom Flotilla." Second, pre-seizure notice and hearing might have frustrated that interest since the vessels could have been easily moved or concealed to avoid seizure. Finally, seizure here was not initiated by self-interested private parties but, rather, by policy-making officials in the Executive Branch. *Compare Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974) (upholding seizure, without prior hearing, of yacht allegedly used for marijuana smuggling). Plaintiffs do not contest the absence of pre-deprivation notice and hearing. Rather, they argue that it was constitutionally impermissible to deny them a *prompt post-seizure hearing* at which it could be argued that their 31 vessels were not properly subject to seizure. The Court agrees.

In circumstances similar to those here, the Second Circuit in *Lee v. Thorton*, 538 F.2d 27 (2d Cir. 1976) determined that some provision for post-seizure hearing was necessary. There, the two petitioners' cars had been seized for customs violations (including bringing in undeclared persons) or retained as security for penalties incurred by the owners for alleged customs violations.

In both cases the vehicles were seized and held, penalties assessed and later mitigated on petition, and the vehicles released only on payment of the mitigated amounts, *all without hearing.*

While acknowledging the "extremely important government interest in policing the passage of persons and articles into the country across its borders," the court in *Lee*, nonetheless, recognized that "the individual has an important interest in the possession of his motor vehicle . . . ." *Id.* at 31. Applying the general formula announced in *Mathews v. Eldridge*, 424 U.S. at 334–35, 96 S.Ct. at 902–903, for the determination of what process is due, the court balanced the cost and inconvenience to the government of providing some means of prompt determination of the legality of the vehicle detentions against the seriousness of the deprivation suffered by the vehicle owners. Having made this rough calculus, the court required:

. . . that when vehicles are seized for forfeiture or as security, action on petitions for mitigation or remission should be required within 24 hours, with notice of the charge, and with the opportunity to file a written response and to make an oral appearance and that, if requested, some kind of hearing on probable cause for the detention before an officer other than the one making the charge should be provided within 72 hours if the petition is not granted in full." *Id.* at 33.

▆▆▆ As in *Lee*, this Court has identified and balanced the *Mathews v. Eldridge* fac-

12. *See, e. g., North American Cold Storage Co. v. City of Chicago*, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908) (upholding the ex parte seizure and destruction of 47 barrels of poultry).

13. *See, e. g., Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950) (authorizing seizures of apparently misbranded, but physically harmless, drugs in advance of any adversary hearing).

14. *See, e. g., Bob Jones University v. Simon*, 416 U.S. 725, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974) (rejecting argument that congressional

provision for only "post-enforcement review of an IRS decision violated procedural due process).

15. *See Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974).

16. *See Fahey v. Mallonee*, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947).

17. *See, e. g., Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (permitting removal of dangerous and disruptive student from school with notice and hearing following "as soon as possible").

tors and similarly concludes that due process required prompt notice and post-seizure hearing. For the reasons noted below, this conclusion applies without regard to whether the seizure was undertaken pursuant to 19 U.S.C. § 1581(e) and 8 U.S.C. § 1323 as Defendants allege, or pursuant to 8 U.S.C. § 1324 as Plaintiffs contend.

The private interest of the Plaintiffs in the uninterrupted use of their vessels is substantial. Based upon uncontroverted testimony adduced at the June 16 hearing, the Court finds that these Plaintiffs' ability to make a living depends upon the availability of their vessels. Evidence adduced at the hearing also suggested that the commercial fishing season is currently underway, and any protracted delay in returning the vessels would substantially reduce Plaintiffs' income for the entire year. Moreover, the Court takes judicial notice, see Fed.R.Evid. 201(c), that Key West is a waterbound community and that access to both the necessities and amenities of life may well depend upon a boat.

■ At the other end of the scale, the governmental interests at stake in this case, similar to those in *Lee*, are also substantial. Those interests include policing the borders of this country in order to enforce the immigration laws and to deter violations of those laws. They also encompass national security considerations, as well as the government's interest in formulating foreign policy and conducting international relations. However, the Court finds that simply giving a prompt post-seizure hearing does not compromise the government's interests in any way. Similarly, the Court concludes that insofar as this case implicates concerns about law enforcement at sea, cf. *United States v. Williams*, 617 F.2d 1063 (5th Cir. 1980) (upholding warrantless searches and seizures of maritime vessels), those concerns do not justify ignoring the fundamental safeguards contained in the due process clause. To conclude otherwise would amount to a finding that due process stops at the water's edge.

■ The only government interest genuinely at stake here is that of avoiding the inconvenience and expense of a reasonably prompt hearing to establish the propriety of the continued detention of the vessels. Such considerations, while relevant, are never controlling factors when determining the right to procedural due process safeguards. *Mathews v. Eldridge*, 424 U.S. at 347–48, 96 S.Ct. at 908–909; *Stypmann v. City & Cty. of San Francisco*, 557 F.2d 1338, 1343 at n. 15 (9th Cir. 1977). The fact that Congress, evidently contemplating a hearing, directed that some procedure be developed for the prompt return of vessels improperly seized in some circumstances, suggests it is neither unduly burdensome nor unduly costly to do so. Moreover, based upon the record now before it, the Court concludes and finds that the cost to the government would not be undue here since administrative machinery is available and, as noted above, is expected to function on an expedited basis where seizures are made pursuant to 8 U.S.C. § 1324(b).

■ Defendants contend that the administrative notice and hearing mechanisms contained in 8 C.F.R. Part 280 suffice for due process purposes. Indeed, 8 C.F.R. §§ 280.12–15 do provide for notice, an interview by an immigration officer, development of a record and an appeals procedure. Those regulations, however, are deficient in at least two respects. First, they provide for mitigation of fines imposed under the Immigration and Naturalization Act but make no provision for directly raising the propriety of the vessel seizures. Secondly, assuming the process could accommodate the latter claims, the cited regulations, nonetheless, fail to set forth any time periods for resolution of an owner's claim that his vessel was improperly seized. Moreover, there is nothing in the record suggesting that the government acts expeditiously in these matters despite the absence of guidelines.

The regulations are thus inadequate to satisfy the demands of procedural due process. If Plaintiffs were relegated to pursuing the return of their vessels through 8 C.F.R. Part 280, and those administrative procedures run their course, due process

would be nothing more than an empty phrase. By the time the appropriate administrative agency rendered its decision on their claims, Plaintiffs would likely already have suffered irreparable injury.

■ If, as Defendants maintain, the seizures here were made pursuant to the Customs Boarding Statute, 19 U.S.C. § 1581(e), the administrative provisions for notice and hearing contained in 19 C.F.R. § 162.31, *et seq.* were applicable. It appears from the record, however, that Plaintiffs neither received notice of those administrative processes nor did Defendants make those processes available to Plaintiffs. The Court need not say whether those processes comport with due process. Suffice it to note that Defendants' failure to comply with their own administration regulations concerning notice and hearing is itself violative of due process.

■ On the other hand, if, as Plaintiffs argue, the seizures here were to be treated as being made under 8 U.S.C. § 1324(b), the administrative hearing mechanisms in 8 C.F.R. Part 274 were to be available to Plaintiffs. Again, it is unnecessary for the Court to determine whether those hearing provisions satisfy due process because Defendants denied Plaintiffs access to them, claiming they were inapplicable. Assuming Plaintiffs are correct in their assertion that the 8 C.F.R. Part 274 hearing provisions were applicable, denial of access is itself violative of due process.

■ In sum, the Court finds due process required that Plaintiffs be provided notice and a timely hearing in which they could contest the propriety of the seizure of their vessels. Of the three forums conceivably available to Plaintiffs to contest the seizures, the first, 8 C.F.R. Part 280, was inadequate. As to the remaining two, 8 C.F.R. Part 274 and 19 C.F.R. § 162.31, *et seq.*, access was effectively denied by the government.

(III)

■ As indicated, the Court finds that due process required that Plaintiffs be

afforded a prompt post-seizure hearing to determine the validity of the seizure of their vessels. Having so found, the question then becomes whether Plaintiffs are entitled, by way of preliminary injunctive relief, to the immediate use of their vessels. For the Court to restore the status quo as it existed prior to the seizure of the vessels, Plaintiffs must satisfy the four prerequisites for granting a preliminary injunction, as set forth in *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974): (1) a substantial likelihood that Plaintiffs will prevail on the merits; (2) a substantial threat that Plaintiffs will suffer irreparable injury if the injunction is not granted; (3) the threatened injury to Plaintiffs outweighs the threatened harm the injunction may do to Defendants; and (4) granting the preliminary injunction will not disserve the public interest. The Court concludes, from the evidence presented, that the foregoing prerequisites have been satisfied and that a preliminary injunction should, therefore, issue.

(1) *Likelihood of Success on the Merits*

■ Plaintiffs have carried their initial burden of demonstrating a substantial likelihood of prevailing on the merits. Plaintiffs contend that seizure of their vessels, whether for purposes of forfeiture or as security for payment of fines, was unjustified inasmuch as they never intended to return to the United States with illegal aliens. Rather, Plaintiffs maintain the violations of immigration law with which they have been charged and for which their vessels were seized were committed while Plaintiffs were acting under duress. At common law, duress was said to excuse criminal conduct where the actor was under an unlawful threat of imminent death or serious bodily injury, which threat caused the actor to engage in conduct violating the literal terms of the criminal law. *See, e. g., United States v. Bailey*, 444 U.S. 394, 100 S.Ct. 624, 634, 62 L.Ed.2d 575 (1980). Significantly, this common law notion of duress has been incorporated in 8 U.S.C. § 1324(b)(1)(A), which authorizes seizure of

vessels except when the owner or other person in charge of such vessel was not, at the time of the alleged illegal act, a consenting party or privy thereto. Although the other provisions under which the government might proceed (i. e., 8 U.S.C. §§ 1321, 1323; *see* note 7 *supra*) do not expressly provide for the defense of duress, it is logical to assume that duress must be considered as a mitigating factor in assessing damages under those sections. *Cf. United States v. Barbacoff*, 416 F.Supp. 606 (D.D.C.1976) (where statutory scheme provided for civil penalties regardless of intent, intent would be considered in mitigation).

 From the evidence presented, the Court would preliminarily find that Plaintiffs have an arguably viable defense of duress, which would render seizure of their vessels improper and would entitle them to mitigation of fines assessed under 8 U.S.C. §§ 1321, 1323 or 1324.[18] The testimony is uncontroverted that Plaintiffs intended to transport only a limited number of specified persons, mostly relatives and friends, all of whom Plaintiffs assumed had valid visas for entry into the United States. Despite these intentions, Plaintiffs were required by armed soldiers of the Cuban Government to take on board their vessels other Cuban nationals, whether documented or not. Testimony adduced at the hearing indicates that Cuban gunboats in fact prevented Plaintiffs from departing Mariel Harbor without bringing back Cuban nationals whose entry into the United States would, under the applicable immigration laws, be illegal.[19] For example, one of the Plaintiffs herein, who sought to pick up 20 family members, was forced to overload his vessel with 134 additional Cuban passengers. That some boats in the "Freedom Flotilla" returned without illegal aliens aboard in no way bears upon the coercion to which *these* Plaintiffs were allegedly subjected. So too, the fact that Plaintiffs received money for the transportation of their Cuban passengers is irrelevant to the duress under which Plaintiffs acted in connection therewith.

 In light of the foregoing, then, the Court is persuaded that Plaintiffs are likely to prevail on their challenges to the propriety of Defendants' actions by reason of duress. The Court recognizes that, while duress is normally an individual defense, the extraordinary series of events which emerge from the testimony appear peculiarly applicable to the 19 Plaintiffs and 31 vessels involved herein. Of course, the issue of duress is not resolved as to any other party or vessel not before the Court.[20] Nor does the Court foreclose a further exploration of the defense of duress which Plaintiffs may raise in the context of any subsequent hearing.[21] On the record before the Court, however, it cannot be said that Plaintiffs would definitely not prevail on the merits of their claim with respect to the *seizure* of their vessels, or the assessment of fines against them under 8 U.S.C. §§ 1321, 1323 or 1324, and in light of the injury threatened to Plaintiffs and the balance of

18. Plaintiffs would be entitled to avail themselves of the defense of duress, even though no statute, such as 8 U.S.C. § 1324(b)(1)(A) so provided, at least on the issue of mitigation of damages. *Cf. United States v. Barbacoff, supra*.

19. Mariel Harbor was described in uncontroverted testimony as entrenched with gunboats and armed soldiers, which tends to support Plaintiffs' defense of duress, i.e. that the threatening conduct of Cuban armed forces produced in Plaintiffs a *reasonable* fear of immediate death or serious bodily harm to themselves or their passengers.

20. The Court emphasizes that its determination on the issue of duress relates solely to those individual plaintiffs before the Court, and is only a preliminary finding. Thus, the Court does not foresee that any other tribunal, either judicial or administrative, would be bound by the Court's determination on this issue. Indeed, because the determination is preliminary, this Court itself may, of necessity, make a contrary finding based upon the record developed at the trial on the merits. *See Scheinberg v. Smith*, 482 F.Supp. 529, 533 n.11 (S.D. Fla. 1979).

21. The Court contemplates that, insofar as the imposition of fines under 8 U.S.C. §§ 1321, 1323 and 1324 are concerned, Plaintiffs will exhaust their administrative remedies on that issue.

relative hardships between the parties, the Court can say that a sufficient showing of success on the merits has been made to sustain an award of preliminary injunctive relief. *See State of Texas v. Seatrain International, S. A.*, 518 F.2d 175, 180 (5th Cir. 1975).

### (2) *Irreparable Injury*

■ The Court is convinced that Plaintiffs will be irreparably harmed unless a preliminary injunction is granted whereby Plaintiffs are permitted the immediate use of their vessels. Each of the 31 vessels seized by Defendants is a commercial fishing or shrimping boat, from which Plaintiffs derive most, if not all, of their means of support. While Defendants argue that Plaintiffs can secure the release of their vessels upon the posting of bond, the undisputed testimony and affidavits adduced at the hearing indicate that Plaintiffs are financially incapable of posting the face value of the bonds required by the government. *See* n. 8, *supra.* Moreover, the Court notes the difficulty Plaintiffs would have in obtaining commercial bonding. Mr. Barbakoff, a government witness, testified that he believed the fines sought by the government, which often exceed the fair market value of the vessels, would have priority over the lien of a bonding company. No surety would be likely, in those circumstances, to collateralize the amount of the bond by Plaintiffs' vessels. Nor does it appear likely that Plaintiffs would have access to other vessels with which to continue commercial fishing activity in light of the wholesale seizure of vessels participating in the "Freedom Flotilla." To be sure, Defendants have seized over 900 vessels apart from the 31 vessels involved herein.

The Court is aware of the decision in *Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), and finds that the facts of the instant case constitute the "genuinely extraordinary situation" to which the Supreme Court referred in *Sampson* as justifying preliminary injunctive re-lief. This is particularly true where, as in the instant case, a constitutionally protectible property right exists, the deprivation of which constitutes an ongoing, irreparable harm. *See, e. g., American Fed. of Gov. Employees, Loc. 1858 v. Callaway*, 398 F.Supp. 176, 193–195 (N.D.Ala.1975). Plaintiffs are threatened with the loss not only of the use value of their vessels, but also of the ability to earn a livelihood therefrom. The speculative nature of the losses of income and profits from commercial fishing makes unlikely the possibility that such losses could be recoverable by way of monetary damages, either as a matter of fact or as a matter of law. Moreover, the loss to Plaintiffs involves more than a temporary economic dislocation but entails a tremendous disruption in their personal lives and in the lives of their families, the effect of which can never be measured or compensated in terms of dollars.

### (3) *Balance of Relative Hardships*

■ The Court cannot say that granting the relief Plaintiffs request is necessarily injurious to Defendants' interest. Thus, without the use of their vessels, Plaintiffs are deprived of the very means by which they might be able to pay the *in personam* fines which Defendants intend to assess against them. Nothing in the record substantiates Defendants' contentions that continued seizure of Plaintiffs' vessels is necessary to prevent their use in the further immigration of Cuban nationals,[22] or to prevent Plaintiffs from departing altogether, thereby evading the payment of fines to be levied against Plaintiffs. Moreover, Defendants, not having physically seized Plaintiffs' vessels, acknowledge the utility of allowing these vessels to remain in Plaintiffs' custody. An injunction herein would thus not require that the vessels be "returned" to Plaintiffs, only that the terms of the constructive seizure include the ability of Plaintiffs to the continued use of their vessels for domestic commercial purposes. At best, Defendants would incur an admin-

---

**22.** Indeed, Plaintiffs have filed sworn affidavits stating that if their vessels are returned they agree that neither they nor their vessels will enter Cuba or her territorial waters.

istrative inconvenience, which the Court concludes is outweighed, on balance, by the harm threatened to Plaintiffs.

### (4) *Disservice to Public Interest*

To restore to Plaintiffs the right to use their vessels would not, in the opinion of the Court, disserve the public interest. Defendants argue that Plaintiffs can contest the validity of the seizure of their vessels only at an administrative hearing in connection with the fines Defendant seek to impose pursuant to 8 U.S.C. § 1323. However, whether or not there has been an unconstitutional deprivation of property is peculiarly a matter for judicial determination. Accordingly, the Court need not await an administrative ruling on the matter to find that seizure of the vessels without a prompt hearing thereafter denied Plaintiffs due process.

The law is well settled that resort to administrative remedies is not required where: (1) there is no adequate administrative remedy, *Rhodes v. United States*, 574 F.2d 1179, 1181 (5th Cir. 1978); (2) there are extensive administrative delays which render administrative remedies inadequate to help Plaintiffs, *Camenisch v. University of Texas*, 616 F.2d 127, 134 (5th Cir. 1980); (3) there is a clear showing of irreparable injury, *Rhodes, supra* ; (4) there is a substantial showing that Plaintiffs' constitutional rights have been violated, *McClendon v. Jackson Television, Inc.*, 603 F.2d 1174, 1177 (5th Cir. 1979).

As applied to the instant case, each of the foregoing factors supports the Court's conclusion that granting Plaintiffs the requested relief is consistent with the public interest. To begin with, Defendants implicitly concede the absence, under 19 U.S.C. § 1581(e), of an administrative mechanism whereby Plaintiffs would be afforded a prompt post-seizure hearing on the validity of the seizure of the vessels. In this regard, Defendants cite no specific authority in support of the bonding requirements they have established. Secondly, even if this Court were to apply the procedures promulgated under the immigration laws, the sheer number of vessels involved in these unique circumstances would excessively delay the administrative process beyond any real opportunity to award Plaintiffs meaningful relief. Third, as discussed above, Plaintiffs have made a clear showing of irreparable harm. That is to say, an ultimate administrative resolution of the instant controversy in Plaintiffs' favor might well be an empty victory if this Court were not to prevent the irreparable harm that Plaintiffs would otherwise suffer by reason of the seizure of their vessels.

Finally, the Court reiterates its concern over the gravity of the denial of Plaintiffs' due process rights. The Court is not unmindful of the public interest in enforcing our nation's immigration laws. However strong that public interest may be, it is nevertheless the function and duty of this Court to ensure that these laws are enforced in a manner consistent with the constitutional protections to which Plaintiffs are entitled. Indeed, the public interest would appear to lie in the enforcement of our nation's immigration laws through the *least* intrusive means available to Defendants. It is a difficult judicial task to find that a coordinate branch of government has infringed upon the due process rights of some of its citizens, but the Court cannot ignore its responsibility towards those citizens. "An essential ingredient of our rule of law is the authority of the courts to determine whether an executive official or agency has complied with the Constitution . . . ." *Committee for Nuclear Responsibility, Inc. v. Seaborg*, 463 F.2d 788, 793 (D.C.Cir. 1971).[23]

---

23. This Court is cognizant of the brief Order entered by the United States District Court for the Southern District of Georgia in *Cesaroni v. United States*, CV480–139 (S.D.Ga. June 9, 1980), which also arose out of the "Freedom Flotilla." There, the Court reached a contrary conclusion to that reached by this Court in the instant litigation. The difference in results of the two cases may reflect differences in the record that was developed before each Court at its respective hearing. To the extent that *Cesaroni* is not in accord with this Court's opinion on the legal issues, however, this Court chooses not to follow *Cesaroni* on the basis of the reasoning set forth in this opinion.

(IV)

It is an established principle of law that "[w]henever the extraordinary writ of injunction is granted, it should be tailored to [compel] no more than what is reasonably required to accomplish its ends." *Consolidation Coal Co. v. Disabled Miners of So. W. Va.*, 442 F.2d 1261, 1267 (4th Cir. 1971), *cert. denied*, 404 U.S. 911, 92 S.Ct. 228, 30 L.Ed.2d 184 (1971). Applying this principle here, the Court has sought to structure a preliminary injunction designed to minimize the injury Plaintiffs are incurring, while accounting for Plaintiffs' ability to post bond in accordance with Fed.R.Civ.P. 65(c) and, at the same time, seeking to protect the government's legitimate interests.

In view of the foregoing discussion, Plaintiffs' Motion for Preliminary Injunction is GRANTED, and it is

ORDERED AND ADJUDGED as follows:

(1) Subject to the conditions set forth below, Plaintiffs' 31 vessels are released from any prohibition on use in lawful domestic fishing or shrimping operations. Prior to the vessels' use in such fishing or shrimping operations, Plaintiffs shall file with the Clerk of this Court as to each vessel involved, a bond in the nature of a personal surety bond in the amount of $30,000 for vessels less than 65 feet, and in the amount of $50,000 for vessels exceeding 65 feet. Each personal surety bond shall be secured and collateralized by a valid, written security interest or lien in proper recordable form on the vessel involved, running in favor of the United States of America (both the bond and lien shall run in favor of the United States of America). The forms of bond and the recordable liens (Exhibit A) shall be submitted to any United States Magistrate in the Southern District of Florida, for review and approval, and shall thereafter be recorded in the office of and with the proper recorder of such instruments.

(2) The plaintiffs shall execute and properly record a preferred ships mortgage in the amount of $1.00 for any vessel not presently so mortgaged, and the owner or attorney for the owner shall certify to the magistrate that an earlier preferred ship's mortgage or a new $1.00 preferred ship's mortgage has been and is presently recorded against each vessel before the magistrate may authorize release of the vessel.

(3) With respect to each vessel, the plaintiffs shall maintain Hull Insurance and Protection and Indemnity Insurance in an amount equal to the full fair market value of the vessel, or at the owner's option, in an amount sufficient to pay off all outstanding mortgages, liens, security interests, and the amount of the fine noticed against the owner by the Immigration and Naturalization Service. The insurance coverage shall be pre-paid by the owners of the vessels, with appropriate loss payable clauses running in favor of the United States, as its interest in each vessel shall appear. Evidence that this insurance has been obtained shall be presented to the magistrate prior to release of the vessel.

(4) A magistrate may authorize one temporary ten day release of the vessel without full pre-paid insurance, if the vessel and its owner are in compliance with all other terms of this order, and if the owner or the owner's attorney certifies to the magistrate that an application for the required insurance has been made pursuant to the attached Exhibit B. At the conclusion of this ten day period, or sooner, the owner or his or her attorney shall submit to the magistrate evidence that the required insurance has been obtained. No vessel shall be permitted a second temporary release.

(5) No sale, transfer or other conveyance of title shall occur, nor shall any vessels' name, registration or vessel numbers be changed or altered (except to change state registered or unregistered vessels to Federally documented vessels), nor shall any equipment be removed from the said ves-

sels. No vessel shall be mortgaged without prior approval of the court, except as provided in paragraph 2, above, with regard to the $1.00 mortgage.

(6) None of the vessels released pursuant to this order shall travel to Cuba or any foreign port.

(7) Each vessel shall be and remain home-based at that dockage under which the vessel was home-based prior to its voyage to Cuba.

(8) No vessel released under this Order shall be leased, chartered or hired out; nor shall any such vessel be given or loaned out to any third party, except that the owner may employ a captain or master and crew for domestic fishing upon compliance with the other provisions of this order.

(9) The owner of each vessel shall display under glass or clear water proof cover in the wheel house or cabin of his vessel a notice in both Spanish and English containing the exact text as set forth in the attached Exhibit C.

(10) Each owner of a vessel released under this order shall inform every person, including all crew members, who use or board a released vessel:

a) that operation of the vessel is restricted by court order;

b) that the vessel may only be used for domestic fishing;

c) that the vessel may not travel to Cuba or any other foreign country; and

d) that violation of these restrictions will subject the violator or violators to criminal prosecution, fines and/or contempt of court proceedings.

(11) Each vessel owner shall require the captain, master or other individual in command of a released vessel to execute, prior to taking command and sailing with the vessel, the attached Exhibit D. Each new captain, master or other person who takes command shall also be required to execute Exhibit D prior to taking command and sailing with the vessel. Each owner shall forward these certifications to the United States Customs Service at the address listed in paragraph 13.

(12) Prior to the initial release of a vessel, each owner shall certify to the magistrate:

a) that he has placed the notice required in paragraph 9 in the wheelhouse or cabin (Exhibit C);

b) that he has executed the personal surety bond and lien or security interest required in paragraph 1;

c) that he has had the captain, master or other person in command of the vessel execute the attached Exhibit D;

d) that he has or will inform the crew and other persons boarding the vessel of the restrictions on its use;

e) that he has obtained or applied for the insurance required by this order, as the case may be; and

f) that the vessel will not be used for any purposes other than domestic fishing, and will not travel to Cuban or any other foreign ports or waters.

(13) Each owner shall regularly report on the status of his compliance with the order, by completing the attached Exhibit E. The certified report, set forth in Exhibit E, shall be completed by each owner and mailed by certified mail to:

United States Customs Service
77 Southeast 5th Street
Miami, Florida 33131
Attn: Vessel Forfeiture
D. JONES

During the first month of release, this report shall be completed and mailed every two weeks after release. Thereafter, the report shall be prepared and mailed every month until further order of the court.

(14) No vessel released pursuant to this order shall leave its present berth until a United States Magistrate has issued a release order (see Exhibit F), which shall at all times be kept with and remain with the vessel's other documentation papers.

(15) Upon presentation of a copy of the magistrate's order to the United States Customs Service, the owner may remove the Customs notice of seizure affixed to the vessel, and may use the vessel under the limitations set forth in this order.

(16) Violations of the conditions of release set forth in this order will subject the plaintiff vessel owners to contempt of court.

(17) Nothing herein contained is intended to, nor shall it, alter, modify or change any lien in favor of the United States or any of its agencies authorized, created or granted by law, and nothing herein contained shall effect or alter any rights or remedies provided by law to the United States or any of its agencies, except as specifically modified herein.

(18) Nothing herein contained is intended to, nor shall it, alter, modify or change the administrative and/or judicial rights, remedies or defenses that the vessel owner(s) or captain(s) may have regarding imposition of fines under the Immigration and Nationality Act or removal of the liens provided for herein if they prevail regarding remission or mitigation of such fines.