Rafael FERNANDEZ–ROQUE, et al., Plaintiffs,

v.

William French SMITH, et al., Defendants.

Moises GARCIA–MIR, et al., Plaintiffs,

v.

William French SMITH, et al., Defendants.

Orlando CHAO–ESTRADA, Petitioner,

v.

William French SMITH, et al., Respondents.

Civ. A. Nos. C81–1084A, C81–938A and C81–1350A.

United States District Court, N. D. Georgia, Atlanta Division.

April 28, 1982.

926

Dale M. Schwartz, John A. Pickens, Myron N. Kramer, Deborah S. Ebel, Kenneth Hindman, David A. Webster, Atlanta, Ga., for plaintiffs.

Douglas P. Roberto, Asst. U. S. Atty., Atlanta, Ga., Daniel E. Fromstein, Dept. of Justice, Washington, D. C., for defendants.

TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| | Introduction | page | 927 |
| I. | Habeas Corpus Jurisdiction | page | 928 |
| II. | Plaintiffs' Motion to Amend the Complaint | page | 930 |
| III. | Jurisdiction Over Claims of Amended Complaint | page | 931 |
| A. | Allegations of Complaint, as Amended, and Claims for Relief | page | 931 |
| | 1. Part VII of Amended Complaint | page | 931 |
| | 2. Part VIII of Amended Complaint | page | 932 |
| B. | Jurisdictional Bases Offered by Plaintiff Class | page | 933 |
| C. | Structure of Jurisdiction Discussion | page | 934 |
| D. | Are the Claims in the Amendments to the Complaint Cognizable Under the Convention and Protocol? | page | 934 |
| E. | Judicial Review of Final Exclusion Orders | page | 935 |
| | 1. Finality | page | 935 |
| | 2. Exhaustion of Administrative Remedies | page | 936 |
| | 3. Conclusion | page | 939 |

F.  Claim of Entitlement to Remand to INS for Classwide Hearing Based on New, Material Evidence ..................... page 939

   1. *Coriolan* .............................. page 939
   2. Plaintiffs' Claim ....................... page 939
   3. The Government's Response ............. page 941
   4. Futility of Exhausting Individual Administrative Remedies ................. page 941
   5. Merits of Plaintiffs' Claim ............. page 943
   6. Lack of Jurisdiction ................... page 943

G.  Propriety of Classwide Review of Final, Exhausted Exclusion Orders .............. page 945

IV.  Proceedings Contemplated After Appeal ... page 947

V.  The Injunction ......................... page 947

VI.  Certification for Interlocutory Appeal .... page 948

   Conclusion ............................ page 948

SHOOB, District Judge.

## INTRODUCTION

The United States Court of Appeals for the Eleventh Circuit has remanded these complex consolidated cases with this instruction:

> Since we find it imperative for the district court to resolve the question of its jurisdiction, we remand this case with the direction that it conduct forthwith only such hearing as is necessary to a determination of whether subject matter jurisdiction exists. Such hearing should be conducted without any discovery as to issues other than that of jurisdiction. Upon the conclusion of such hearing, the district court shall enter an opinion setting forth the reasons for its decision. To the extent, if any, that the appellees have altered the nature of the relief sought in their amended complaint, the district court shall specify the exact nature of the claim or claims as to which jurisdiction is

now alleged to reside in the district court. The question of subject matter jurisdiction shall then be certified to this Court, pursuant to 28 U.S.C. § 1292(b), upon request by any party.

*Fernandez-Roque v. Smith*, 671 F.2d 426, 431 (11th Cir. 1982). The mandate of the Eleventh Circuit was made the judgment of this Court on March 10, 1982. On the same day, a separate order was filed establishing a briefing schedule and setting a hearing. On March 16, 1982, oral argument was heard on the question of this Court's subject matter jurisdiction. Additional briefs were filed, as requested by the Court, and the question which the Eleventh Circuit's mandate requires this Court to answer is now ripe for decision.[1] This order and opinion is filed to comply with the mandate.

In addition to the Court's ruling on its subject matter jurisdiction over the class' refugee and asylum claims in Part III of this order, this order (1) discusses the Court's jurisdiction over the habeas corpus portion of the action; (2) grants plaintiffs' motion to amend their complaint; (3) sets forth the limited proceedings presently envisioned by the Court upon the return of this litigation from the Court of Appeals in the event this Court's jurisdiction over the second portion of the case is upheld; (4) continues in effect the temporary restraining order to preserve the status quo pending appellate review, and defers ruling on the government's motion to dissolve the injunction and on plaintiffs' application for a preliminary injunction; and (5) upon request by the government, certifies this order and opinion for immediate interlocutory

---

[1]  *See* this Court's order of November 4, 1981 as to why it delayed deciding this question. While the Court was duty bound from the beginning to determine in these cases—as in all cases—whether it had subject matter jurisdiction, the press of other business is such that the Court ordinarily inquires as to its own jurisdiction (except in those cases where jurisdiction is clearly lacking) when that jurisdiction is challenged by a motion to dismiss. In these consolidated cases, the Court's jurisdiction was not directly placed in issue by a motion calling for a ruling (other than plaintiffs' motion for a preliminary injunction) until March 16, 1982, when the government filed a motion to dissolve

the injunction for lack of subject matter jurisdiction. As is clear from the transcripts of the status conferences, the Court intended to decide the jurisdictional question as part and parcel of its ruling on plaintiff class' application for a preliminary injunction.

Further, the Court agrees with the government that of the "two separate roads" travelled by this litigation, the "first avenue, both in time and in effort and importance, has been appellees' claim that they were being improperly detained . . . ." Brief for Appellants, page 3. The Court gave this aspect of the case far more attention than it did the claims of plaintiff class in its amended complaint.

appeal under 28 U.S.C. § 1292(b) pursuant to the Eleventh Circuit's mandate.

## I.  Habeas Corpus Jurisdiction

Named plaintiff Moises Garcia Mir filed his original class action complaint in the United States District Court for the District of Kansas on January 8, 1981.[2] Styled a complaint "For Declaratory Judgment, Preliminary and Permanent Injunctions," the complaint alleged that the continued detention of plaintiff and those similarly situated violated both United States municipal law and international law.  Plaintiff Mir further alleged that defendant had not afforded him a procedurally adequate hearing on the question whether he should suffer further detention.  Plaintiff and his class prayed for a declaratory judgment that continued incarceration would violate both domestic and international law, and for a preliminary and permanent injunction compelling defendant to (a) release plaintiff and his class or (b) conduct procedurally adequate hearings to determine whether continued detention of plaintiff and his class is warranted, by a finding that the detainee is likely to abscond, is a threat to the security of the United States, or is a serious threat to persons or property in the United States.

Thus, the complaint as originally filed in Civil Action No. C81–938A was essentially a habeas corpus petition on behalf of a class. (While the class was not certified until after the case was transferred to Georgia, Judge Rogers of the Kansas district court indicated in his order of transfer that, in his opinion, the requirements of Rule 23 had been met.  Order of May 12, 1981, pages 3–12.)  After the case was transferred to this district court, the focus of plaintiff class' habeas claims became whether the Attorney General, acting through Immigration and Naturalization Service ("INS") District Directors, had abused his discretion on a classwide basis by denying or revoking parole.[3]  Very shortly after this Court's decision in *Soroa-Gonzales v. Civiletti, supra,* named plaintiff Rafael Fernandez-Roque brought his action on behalf of a class of all Cuban detainees at the Atlanta Federal Penitentiary who were excludable *solely* on the basis of lack of entry papers, 8 U.S.C. § 1182(a)(20).  Civil Action No. C81–1084A, filed June 5, 1981.  Because the Fernandez-Roque class would have been a subclass of the Garcia-Mir class, the two actions were consolidated.  Order of the Court, July 14, 1981.  The third of these three lawsuits, *Orlando Chao-Estrada v. Smith,* Civil Action No. C81–1350A, was filed by an individual detainee on July 17, 1981, and consolidated with the two class actions by order dated July 24, 1981.[4]

**2.**  Prior to the filing of the answer, *see* Fed.R. Civ.P. 15(a), plaintiff filed an amended complaint.  The primary purpose of the amendment was to add other named plaintiffs to the action.

**3.**  In a habeas corpus action brought by a single Cuban detainee held at the Atlanta Federal Penitentiary, this Court concluded that it had subject matter jurisdiction to review the parole decision of the INS District Director under 28 U.S.C. § 2241 (habeas corpus jurisdiction), 8 U.S.C. § 1329 (district court jurisdiction to review, *inter alia,* final INS administrative decisions, other than final orders of deportation or exclusion), and 28 U.S.C. § 2241 (federal question jurisdiction).  *Soroa-Gonzales v. Civiletti,* 515 F.Supp. 1049, 1054–57 (N.D.Ga.1981).  *See also Ahrens v. Rojas,* 292 F.2d 406 (5th Cir. 1961).  This Court adopted the reasoning in *Soroa-Gonzales, supra,* in these consolidated cases in its order dated August 20, 1981, 91 F.R.D. 239, 242 (N.D.Ga.1981).

**4.**  Aside from these three consolidated cases, other litigation has been spawned by the mass exodus of approximately 125,000 Cubans from Mariel Harbor to Southern Florida during the spring and summer of 1980.  This Court has a handful of other suits brought by detainees; before the class was certified, other judges in this district had cases filed by individual Cuban detainees.  *See, e.g., Luis Perez Ramirez v. Smith,* Civil Action No. C80–1825A (N.D.Ga. June 30, 1981 (Freeman, J.) (continued detention of Cuban constituted abuse of discretion; writ subsequently issued).  Issues similar to those presented by these consolidated cases have arisen in other districts.  *See Pedro Rene Comas Banos v. Crosland,* CA80–2677 (D.D.C., Dec. 11, 1980); *Lazaro Alonso-Martinez v. Meissner,* Civil Action No. C81–2233 (D.D.C., Oct. 16, 1981); *Fernandez v. Wilkinson,* 505 F.Supp. 787 (D.Kan., Dec. 31, 1980), *aff'd sub nom. Rodriguez-Fernandez v. Wilkinson,* 654 F.2d 1382 (10th Cir. 1981).  The "Freedom Flotilla" also led to litigation involving legal issues unrelated to those posed by these cases.  *See*

On August 7, 1981, on plaintiffs' renewed motion for class certification, this Court conditionally certified a class of all Cuban nationals incarcerated at the Atlanta Federal Penitentiary who arrived in this country as part of the "Freedom Flotilla" of 1980. 91 F.R.D. 117, 122–24; *modified at* 91 F.R.D. 239, 240, n. 1. The Court also certified twelve subclasses, and issued a series of show cause orders to the government.

At the first hearing on August 17, 1981, the government failed to show sufficient cause why members of subclasses (1) and (2) should not be released. The Court then issued the writ of habeas corpus to the 226 detainee class members in subclasses (1) and (2).[5] 91 F.R.D. 239, 243. These detainees were to be released on parole as soon as they were approved for sponsorship or resettlement by the United States Catholic Conference, or by any of the other ten agencies within the American Council of Volunteer Agencies. The Court also ordered the release on the same terms of 155 detainees as to whom the government announced on August 17, 1982, in open court, that it had no further objections to release.

Subsequently, the Court modified its order to permit the government to perform its own review of the cases of the 226 members of subclasses (1) and (2), under the Attorney General's "Status Review Plan." *See* order of this Court dated August 21, 1981. Since that date, the Court has issued no further orders granting writs of habeas corpus. In effect, *litigation* of plaintiff class' habeas corpus petition has been deferred while the Attorney General re-exercised his parole discretion by expeditiously conducting a Status Review of each detainee. The process is now very nearly complete. As of April 5, 1982, the government

*United States v. Anaya*, 509 F.Supp. 289 (S.D. Fla.1980) (dismissing 84 criminal indictments against 336 defendants accused of illegally bringing the "Marielitos" into the U. S.); *United States v. Sanchez*, 520 F.Supp. 1038 (S.D. Fla.1981) (order denying plaintiff government's motion for summary judgment in civil action brought to collect fines imposed on persons accused of bringing undocumented Cubans into the U. S. during the Mariel Boatlift); *Pollgreen v. Morris*, 496 F.Supp. 1042 (S.D.Fla.1980) (government preliminarily enjoined from failing to give owners of vessels, seized on ground they had been used in bringing in undocumented Cubans, a prompt post-seizure due process hearing); *Colon v. Carter*, 507 F.Supp. 1026 (D.P.R.1980) (government preliminarily enjoined from transferring Cuban or Haitian refugees to Fort Allen, Puerto Rico), *vacated*, 633 F.2d 964 (1st Cir. 1980); and *Commonwealth of Puerto Rico v. Muskie*, 507 F.Supp. 1035 (D.P. R.1981) (government *permanently* enjoined from transferring Cuban or Haitian refugees to Fort Allen, Puerto Rico), *injunction vacated sub nom. Marquez-Colon v. Reagan*, 668 F.2d 611 (1st Cir. 1981).

**5.** Classwide habeas corpus *relief* by means of issuing the writ itself is fairly novel; however, a number of circuit courts have upheld the notion of class *certification* in habeas cases, whether certification is accomplished under Fed.R.Civ.P. 23, or by analogy to Rule 23. *See United States ex rel. Sero v. Preiser*, 506 F.2d 1115, 1125–27 (2d Cir. 1974), *cert. den.* 421 U.S. 921, 95 S.Ct. 1587, 43 L.Ed.2d 789 (1975); *Williams v. Richardson*, 481 F.2d 358 (8th Cir. 1973); *Mead v. Parker*, 464 F.2d 1108, 1112–13 (9th Cir. 1972); and *Bijeol v. Benson*, 513 F.2d 965 (7th Cir. 1975). These cases and others from district courts find their support in *Harris v. Nelson*, 394 U.S. 286, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969). *Harris* suggests in *dicta* that class certification should not be denied in habeas corpus actions simply because there is no explicit statutory provision for it. "[T]he habeas corpus jurisdiction and the duty to exercise it being present, the courts may fashion appropriate modes of procedure, by analogy to existing rules or otherwise in conformity with judicial usage. Where their duties require it, this is the inescapable obligation of the courts." *Id.*, 394 U.S. at 299, 89 S.Ct. at 1090. *See also* Note, Multiparty Federal Habeas Corpus, 81 *Harv.L.Rev.* 1482, 1499–1502 (1968); Developments in the Law—Federal Habeas Corpus, 83 *Harv.L.Rev.* 1038, 1070–73 (1970).

Recently, in *Graddick v. Newman*, 453 U.S. 928, 102 S.Ct. 4, 69 L.Ed.2d 1025 (1981), Justice Powell, speaking for the Court in its denial of an application for a stay pending appeal, indicated that "the propriety of the District Court's use of the writ of habeas corpus as a class remedy for prison overcrowding" presented an "interesting and substantial" issue. 453 U.S. at 939, 102 S.Ct. at 8. In *Graddick* the Fifth Circuit had previously declined to stay the district court's order, which granted relief by issuing the writ to 400 prisoners. *Id.*, 453 U.S. at 932, 102 S.Ct. at 7. The question whether class certification might be appropriate in a habeas case was expressly reserved in *Harris v. Nelson, supra*, 394 U.S. at 294, n.5, 89 S.Ct. at 1088, n.5.

has determined that of the approximately 1,800 original class members, each detained for a minimum of fifteen months, 1,133 may be released. The government has determined that these 1,133 Cuban nationals are (1) presently non-violent, (2) likely to remain non-violent, and (3) unlikely to commit any criminal offenses after release. *See* Exhibit 4 to Defendants' Status Report on the Progress of Implementing the Attorney General's "Status Review Plan and Procedures," filed August 17, 1981.[6] Of the 1,133 detainees determined to be releasable, 867 have actually been released to sponsors (arranged, for the most part, by the United States Catholic Conference). 266 detainees are presently at the Atlanta Federal Penitentiary awaiting sponsors. The Status Review Plan has also resulted in a government recommendation for continued detention for 636 Cubans. A few dozen detainees have not yet received final decisions. Unfortunately, five Cuban detainees have been killed while in detention at the Penitentiary; the last one murdered a few weeks ago, age 24, had been approved for release and was simply waiting for a sponsor.

During the past six months as the government's Status Review Plan was proceeding, the time and effort of the Court and counsel for *both* sides has been directed primarily towards resettlement efforts.[7] Now that the Plan has been completed for each detainee class member,[8] counsel for plaintiff class are reviewing the files of the detainees to determine whether or not, after the Attorney General has exercised his parole authority a second time, there may exist new or different classwide bases for challenging the detention of the 636 slated for continued incarceration. Should their search bear fruit, further litigation of the classwide habeas petition will result. If not, it probably will be necessary for the Court to decertify the class as to habeas corpus issues, and to dismiss that portion of the complaint, without prejudice to the right of individual detainees to file their own habeas corpus petitions.

■ In sum, this Court has previously considered its jurisdiction over habeas aspects of this case and has concluded that it has subject matter jurisdiction.

## II. Plaintiffs' Motion to Amend the Complaint

As noted above, the Eleventh Circuit asked this Court to "specify the exact nature of the claim or claims as to which jurisdiction is now alleged to reside in the district court," if plaintiff class has "altered the nature of the relief sought in [the] amended complaint." *Fernandez-Roque, supra,* 671 F.2d 426 at 432. Using the remand as a further opportunity to refine their claims, plaintiffs on March 12, 1982 filed a (third) motion to amend their complaint.[9] Defendants responded that they

---

**6.** In fact, the Status Review Plan seems to have been a very careful screening. The Court is aware of only two or three released ex-detainees who have subsequently been arrested.

**7.** The salutary effect of this Court's temporary restraining order of August 19, 1981, on the sponsorship and resettlement of the Cuban ex-detainees has been noted previously. Order of this Court, November 4, 1981, pages 5–6, n.6. First, the consent TRO permitted the Court and counsel for both sides to devote their time and attention to the habeas portion of the case. Second, the TRO "made those detainee class members released from prison Cuban/Haitian Entrants (Status Pending) as Cuban nationals 'with respect to whom a final nonappealable and legally enforceable order of deportation or exclusion has not been entered.'" *Id.; see also* 8 U.S.C. § 1522 n. Thus the continuation of the TRO made those Cubans released from prison eligible for resettlement funds under the Refugee Education Assistance Act of 1980 (the Fascell-Stone Amendment).

**8.** The government's own plan calls for a re-review of the appropriateness of continued detention at least once a year.

Recently, over 200 additional Cuban detainees were transferred from Fort Chaffee, Arkansas, to the Atlanta Federal Penitentiary. They are presently being reviewed under the Status Review Plan.

**9.** A supplement to plaintiffs' motion to amend was filed the same day to add an inadvertently omitted paragraph to the amendment to the complaint.

Plaintiffs' first motion to amend the complaint was filed July 8, 1981. Their second motion to amend was filed July 13, 1981. Both motions were granted in the Court's order of August 7,

had no objection to the amendment. *See* Defendants' Response to Motion to Amend Complaint, filed March 15, 1982. Accordingly, plaintiffs' motion to amend the complaint is GRANTED. The substance of this amendment and the amendments permitted by the Court's order of August 7, 1981 are discussed in Part III of this order, below.

### III. Jurisdiction Over Claims of Amended Complaint

#### A. Allegations of Complaint, as Amended, and Claims for Relief

The portions of the complaint at issue here (amendments allowed by this order, Part II, *supra*, and by order of the Court dated August 7, 1981, 91 F.R.D. 117, 119–20) are Parts VII (¶¶ 30–41 of the amended complaint) and VIII (¶¶ 42–53 of the amended complaint). Part VII of the amended complaint and its exhibits served as a basis for the Court's temporary restraining order of August 19, 1981.[10] Part VIII of the amended complaint brings plaintiff class' pleadings into line with the arguments and representations of counsel at oral argument before the Court of Appeals.

1. Part VII of Amended Complaint. In their amendment filed July 8, 1981, plaintiffs alleged for the first time that they are "refugees," as that term is defined in the 1951 Convention Relating to the Status of Refugees ("Convention"), *opened for signature* July 28, 1951, *entered into force* April 21, 1954, 189 U.N.T.S. 137, and incorporated by reference in the 1962 Protocol Relating to the Status of Refugees ("Protocol"), *signed* January 31, 1967, *entered into force*

October 4, 1967, 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268 (*entered into force for the United States*, November 1, 1968).[11] A refugee under these treaties is any person who "owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence as a result of such events, is unable or, owing to such fear, is unwilling to return to it." Convention, Article 1.A.(2); Protocol, Article I.1.[12]

Plaintiffs base their claim that they are refugees on their contention that, as members of a large group of Cubans who left their country voluntarily from Mariel Harbor in the spring and summer of 1980, they would suffer imprisonment, torture and death if returned to Cuba involuntarily by the United States. Plaintiffs support their claim, in part, with the United States Department of State's Country Reports on Human Rights Practices, at pages 397–408, regarding Cuba (Report to the Senate Committee on Foreign Relations and House Committee on Foreign Affairs, February 2, 1981); with the affidavits of 14 "Marielitos" who voluntarily returned to Cuba but were badly mistreated there and then cast adrift in small boats between Florida and Cuba; and with statements of officials of the government concerning conditions in Cuba. (Plaintiffs contend that additional facts support their claims and have sought

1981, 91 F.R.D. 117, 119–20. The allegations and claims of the amendments to the complaint are discussed in Part III of this order, *infra*.

**10.** It was largely the serious threat of truly irreparable harm that led the Court to preserve the status quo by the TRO.

**11.** The United States is not a party to the Convention. However, the Protocol incorporates the substantive provisions of the Convention by reference. Protocol, Article I.

**12.** Article 1 further provides:
F. The provisions of this Convention shall not apply to any person with respect to

whom there are serious reasons for considering that:
(a) he has committed a crime against peace, a war crime, or a crime against humanity, as defined in the international instruments drawn up to make provision in respect of such crimes;
(b) he has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee;
(c) he has been guilty of acts contrary to the purposes and principles of the United Nations.

to make discovery of those facts.) Plaintiffs contend that the very fact that they are "Marielitos," that is, members of a social group comprised of members who left Cuba voluntarily in the "Freedom Flotilla" during the spring and summer of 1980, would surely lead to their persecution if they are returned involuntarily to Cuba. They thus claim to be "social group refugees." In general terms, plaintiffs contend that their status as refugees obliges defendants to accord them their rights under the Convention and Protocol.

In particular, plaintiffs contend they are entitled to the protection of Article 31(1), which prohibits the government from imposing "penalties, on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was threatened in the sense of Article 1, enter or are present in their territory without authorization, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence." Plaintiffs claim that their indeterminate, continued incarceration violates Article 31 of the Convention.[13]

Finally, Part VII of the amended complaint alleges that there is no administrative remedy under U.S. law to protect refugees from Article 31 violations; thus, exhaustion cannot be required.

As relief under Part VII of the complaint, plaintiffs seek their immediate release or, in the alternative, "a procedurally adequate hearing to determine: (1) whether each Cuban national so incarcerated has committed a capital crime or a grave punishable act, and if not, (2) whether each Cuban national so incarcerated would be a national security risk or a risk to the public order," ¶ 41 of plaintiffs' amended complaint.

2. Part VIII of Amended Complaint. This portion of the complaint as amended alleges that plaintiffs, as a class, are "refugees" as that term is defined in the Convention and Protocol, and further, that plaintiffs as a class are "asylees" as that term is defined in the Refugee Act of 1980, 8 U.S.C. §§ 1158, 1101(a)(42).[14] They thus claim the protection of the Convention and Protocol.

Part VIII of the amended complaint relies more particularly on Article 33 of the Convention, entitled "Prohibition of expulsion or return" ("Refoulement"), which states:

1. No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

2. The benefit of the present provision may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country.

Plaintiffs claim that their return to Cuba[15] would violate Article 33 of the Convention,

---

13. Plaintiffs also contend that the government's indefinite detention of them violates paragraph two of Article 31:

The Contracting States shall not apply to the movements of such refugees restrictions other than those which are necessary and such restrictions shall only be applied until their status in the country is regularized or they obtain admission into another country. The Contracting States shall allow such refugees a reasonable period and all the necessary facilities to obtain admission into another country.

14. Plaintiffs incorporate by reference ¶¶ 33–34 and the exhibits to Part VII of the amended complaint as the factual basis for their fear of persecution and entitlement to "social group" refugee status and asylum.

15. U.S. law makes no provision for the exclusion of plaintiffs to any country other than Cuba. See 8 U.S.C. § 1227(a) ("Any alien ... arriving in the United States who is excluded under this Act, shall be immediately deported to the country whence he came, in accommodations of the same class in which he arrived, on the vessel or aircraft bringing him, unless the Attorney General, in an individual case, in his discretion concludes that immediate deportation is not practicable or proper.").

as implemented in § 203(e) of the Refugee Act of 1980, 8 U.S.C. § 1253(h)(1).[16] Plaintiffs claim that they cannot be deported back to Cuba "unless it is determined, after balancing the degree of persecution with the degree of criminality, that Plaintiffs are exempted from Article 33 relief or 8 U.S.C. § 1253(h) relief," ¶ 50 of the amended complaint.

Plaintiffs further allege that each class member has applied with an INS District Director for asylum/withholding of deportation, and that each application was denied. Plaintiffs claim that each class member reapplied for asylum/withholding of deportation once exclusion proceedings were commenced, and that each reapplication was denied by an immigration judge after a hearing. Plaintiffs allege that final orders of exclusion were entered for all class members.[17] Finally, plaintiffs claim that no bar to this cause of action is presented by the doctrine that administrative remedies must be exhausted. "Requiring further exhaustion in the form of individual administrative motions to reopen is inadequate," ¶ 51 of the amended complaint.

As relief under this cause of action, plaintiffs "seek judicial review of all final orders of exclusion which have been entered denying class members' applications for asylum/withholding of deportation, and a remand to the administrative agency with appropriate instructions." Plaintiffs have not specifically prayed that each final order of exclusion be set aside.[18] Nor have plaintiffs alleged any basis (such as procedural inadequacy or the like; *see Haitian Refugee Center v. Civiletti*, 503 F.Supp. 442 (S.D.Fla.1980) (appeal pending)) for setting aside, under the appropriate standard of review, the final orders of exclusion entered against class members. The primary relief sought by plaintiffs is the opportunity to present their claim that they are refugees and asylees, on a classwide basis. This is discussed in greater detail below.

### B. Jurisdictional Bases Offered by Plaintiff Class

The original *Mir* class action complaint filed in Kansas alleged that the district court had jurisdiction to hear the claims of Mir and his class pursuant to the provisions of 28 U.S.C. § 1331 (federal question jurisdiction),[19] 28 U.S.C. § 1361 (mandamus jurisdiction),[20] and 8 U.S.C. § 1329 (jurisdiction

**16.** That section of the Refugee Act embodies the operative language of paragraph one of Article 33 within the U.S. legal framework:

Deportation. The Attorney General shall not deport or return any alien (other than an alien described in section 24(a)(19)) [8 USCS § 1251(a)(19)] to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion. (2) Paragraph (1) shall not apply to any alien if the Attorney General determines that—

(A) the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion;

(B) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;

(C) there are serious reasons for considering that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States; or

(D) there are reasonable grounds for regarding the alien as a danger to the security of the United States.

**17.** As the class is presently defined, the allegation that final orders of exclusion have been entered for all class members may be incorrect. However, plaintiffs who have not yet had entered against them final orders of exclusion have no need for injunctive relief to prevent their return to Cuba. *Id.*

**18.** The fact that certain relief is not sought in the pleadings is not determinative; for "the final judgment must grant all the relief to which a plaintiff is entitled, whether or not demanded in the pleadings." *Wright, Law of Federal Courts*, § 67, page 318 (3d ed. 1976).

**19.** *Federal question*
    The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

**20.** *Action to compel an officer of the United States to perform his duty*
    The district courts shall have original jurisdiction of any action in the nature of manda-

over cases arising under Title II of the Immigration and Nationality Act, 8 U.S.C. § 1151 *et seq.*).[21] By the amendment to the *Mir* complaint allowed by the Court's order of August 7, 1981, 91 F.R.D. at 119–20, habeas corpus was made an additional basis for federal jurisdiction.[22] The *Fernandez-Roque* complaint set forth as its bases for jurisdiction 28 U.S.C. § 1331, 28 U.S.C. § 2241 and 8 U.S.C. § 1329. Finally, plaintiffs' most recent amendment to their complaint adds for the first time the jurisdictional provision in 8 U.S.C. § 1105a(b).[23] Those of the above bases of jurisdiction which pertain to the refugee and asylum claims of the class are discussed at greater length below.

### C. Structure of Jurisdiction Discussion

In the remainder of Part III of this order the Court will first examine the claims of plaintiffs in their amended complaint to determine whether any are made directly under the Convention and Protocol, or whether the claims of the class are made under United States legislation which implemented the provisions of these international agreements. Second, the Court will discuss its jurisdiction over what it regards as plaintiffs' first claim for relief under the amended complaint, that the Court should review and set aside the final orders of exclusion entered against class members. Included in this discussion will be treatment of finality and the exhaustion requirement. Third, the Court will discuss its jurisdiction over plaintiffs' second claim for relief under the amended complaint, the claim that plaintiffs are entitled to a remand to the INS for a classwide hearing, based on new and material evidence, on the question of persecution based on plaintiffs' membership in the Freedom Flotilla social group. Finally, the Court will discuss subject matter jurisdiction, its "power to declare the law," [24] with reference to the *class* of plaintiffs.

### D. Are the Claims in the Amendments to the Complaint Cognizable Under the Convention and Protocol?

■ Plaintiff class makes claims under two provisions of the Convention, Articles 31 and 33. Article 31 of the Convention prevents Contracting States from imposing penalties on refugees on account of their illegal entry or presence in the Contracting State, and from applying unnecessary restrictions to the movements of such refugees. Assuming, for the moment, that

mus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

**21.** *Jurisdiction of district courts*
The district courts of the United States shall have jurisdiction of all causes, civil and criminal, arising under any of the provisions of this title. It shall be the duty of the United States attorney of the proper district to prosecute every such suit when brought by the United States. Notwithstanding any other law, such prosecutions or suits may be instituted at any place in the United States at which the violation may occur or at which the person charged with a violation under section 275 or 276 [8 U.S.C.S. §§ 1325, 1326] may be apprehended. No suit or proceeding for a violation of any of the provisions of this title shall be settled, compromised, or discontinued without the consent of the court in which it is pending and any such settlement, compromise, or discontinuance shall be entered of record with the reasons therefor.

**22.** 28 U.S.C. § 2241 provides, in pertinent part:
*Power to grant writ*

(a) Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions. The order of a circuit judge shall be entered in the records of the district court of the district wherein the restraint complained of is had.
\* \* \* \* \* \*
(c) The writ of habeas corpus shall not extend to a prisoner unless—
(1) He is in custody under or by color of the authority of the United States or is committed for trial before some court thereof; or
\* \* \* \* \* \*

**23.** *Limitation of certain aliens to habeas corpus proceedings.*
Notwithstanding the provisions of any other law, any alien against whom a final order of exclusion has been made heretofore or hereafter under the provisions of section 236 of this Act [8 U.S.C. § 1226] or comparable provisions of any prior Act may obtain judicial review of such order by habeas corpus proceedings and not otherwise.

**24.** *Ex Parte McCardle,* 74 U.S. (7 Wall) 506, 514, 19 L.Ed. 264 (1868).

plaintiffs have properly made a claim for relief under Article 31, and that Article 31 is "self-executing," [25] the penalty being imposed, the restriction on plaintiffs' movement, is incarceration.[26] The legality of plaintiffs' detention, measured under municipal law *or* under the Protocol, is not at issue here and is best dealt with as part of the habeas corpus portion of this case. The Court need not determine at this juncture whether plaintiffs have stated a claim under Article 31 not already cognizable under municipal law.

As for Article 33 (prohibition against "refouler"), its crucial terms are incorporated in 8 U.S.C. § 1253(h)(1) in mandatory language.[27] There is no significant difference between the provisions of Article 33 and those of 8 U.S.C. § 1253(h).[28]

Thus plaintiffs have made no claim actionable directly under the provisions of the Convention and Protocol. This makes it unnecessary for the Court to determine whether Articles 31 and 33 are self-executing. All of plaintiffs' claims for relief at issue here are cognizable under municipal law, and the jurisdictional decisions of this Court shall reflect that determination.

E. Judicial Review of Final Exclusion Orders

1. Finality. The most recent figures for the stages at which plaintiffs find themselves in INS exclusion proceedings are found at page 25 of the Brief for Appellants before the Eleventh Circuit Court of Appeals.[29]

25. While "all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land," United States Constitution, Art. 6, "treaties affect the municipal law of the United States only when those treaties are given effect by congressional legislation or are, by their nature, self-executing." *United States v. Postal*, 589 F.2d 862, 875 (5th Cir. 1979), *cert. den.* 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979). As for the question whether a treaty or a provision thereof is "self-executing," this is "a matter of interpretation for the courts when the issue presents itself in litigation, Restatement (Second) of Foreign Relations Law of the United States § 154(1) (1965), and, as in the case of all matters of interpretation, the courts attempt to discern the intent of the parties to the agreement so as to carry out their manifest purpose." *Id.*, 589 F.2d at 876.

One writer has concluded that the Protocol is self-executing. Note, The Right of Asylum under United States Law, 80 *Colum.L.Rev.* 1125, 1129 n.30 (1980). This Court inclines toward that view.

26. The plaintiffs remaining in detention (other than those approved for release and awaiting sponsors) are those who were denied parole and whom the Attorney General determined (after re-exercising his discretion pursuant to the Status Review Plan and Procedure) are not (1) presently non-violent, (2) likely to remain non-violent, and (3) unlikely to commit any criminal offenses after release. The Court does not understand the remaining detained plaintiffs to argue that they are being penalized solely due to their status as refugees; the argument would founder in the face of the government's release of 123,000 out of 125,000 Flotilla Cubans.

27. The statute does place responsibility for making the crucial determination with the Attorney General. However, the decision-making function is not couched in discretionary terms; moreover, the decision is subject to judicial review. In any case, refugees cannot be the persons responsible for declaring their own rights; in each Contracting State, some agency will be responsible. In the United States, it is the Executive (the Attorney General acting through the INS), subject to review by federal courts.

28. If there were significant variance between these provisions, the Refugee Act of 1980 would control, even if Article 33 were self-executing. *See United States v. Postal, supra,* 589 F.2d at 878–79, n.25 ("subsequent federal legislation overrides prior self-executing treaty provisions, *Whitney v. Robertson,* 124 U.S. 190, 194, 8 S.Ct. 456, 458, 31 L.Ed. 386 (1888); *Edye v. Robertson (The Head Money Cases),* 112 U.S. 580, 599, 5 S.Ct. 247, 254 [28 L.Ed. 798] (1884)").

29. The Court sought updated figures on the class members but was told that it would take at least 3–4 weeks to assemble them. This is due primarily to the dispersion of files caused by the Status Review Plan. The Court did not wish to delay this decision further simply for updated figures.

The claims for asylum status by those class members who have been and are being released may become moot at a later date, should the Congress and the President decide to accord the released former detainees the same immigration status it accords the rest of the 125,000 Marielitos.

Statistics compiled by the INS, see Add. 319, establish that: all 1813 Cuban detainees as of August 24, 1981, at the Atlanta Penitentiary filed claims for asylum, with all applicants being interviewed by the INS; that 97% (1752 of 1813) of those asylum applications have so far been forwarded to the Department of State for an advisory opinion, with 86% of those forwarded (1515 of 1752) being returned with an opinion; that of the 1515 returned by the Department of State the district director has denied asylum in 1408 cases, with decisions pending in the balance of the cases; and the immigration judges have completed 1700 exclusion hearings and rendered 1640 decisions thus far; that the immigration judges have denied asylum and ordered the aliens excluded in 1602 cases while granting 38 class members asylum. Of the 1640 decisions entered by the immigration judges 580, or more than one third, have been appealed to the Board of Immigration Appeals. In contrast, more than 1000 of the petitioners have decided not to appeal their order denying them asylum to the Board. Of the 38 aliens granted asylum by the immigration judges, the INS has appealed 50%, or 19 cases, to the Board, Add. 317 ¶ 12. Of the 580 decisions appealed to the Board, decisions have been issued in 150 cases, with the balance still before the Board.

In terms of the finality of their exclusion orders, plaintiffs may be broken down into four groups: (1) those plaintiffs who have not received final orders of exclusion from an immigration judge ("IJ") after an exclusion hearing; (2) those plaintiffs who have had final orders of exclusion entered against them by an IJ, and who have not appealed that final decision to the Board of Immigration Appeals ("BIA"); (3) those plaintiffs who have had final orders of exclusion entered against them by an IJ, who have appealed to the BIA and whose final orders of exclusion have been affirmed on appeal; and (4) those plaintiffs who have had final orders of exclusion entered against them by an IJ, who have appealed to the BIA and who are waiting for a decision.[30]

The first group should by now contain only a few of the plaintiffs. The second group, as of August 24, 1981, contained about 1,022 plaintiffs. They have had final orders of exclusion entered against them and have no administrative remedy other than a motion to reopen. The question whether they have exhausted their administrative remedies is discussed below; however, there is no question that there is a final order of exclusion against these 1,022, enforceable but for this proceeding. As for the third group of approximately 150, they have absolutely final exclusion decisions, enforceable but for this proceeding. Their only remedy within the administrative scheme is a motion to reopen. As for the final group of roughly 430, their individual orders of exclusion are final but will not be "enforceable" until each appeal is decided against the plaintiff by the BIA.

2. Exhaustion of Administrative Remedies. 8 U.S.C. § 1105a(c) provides, in pertinent part:

(c) Exhaustion of administrative remedies or departure from United States; disclosure of prior judicial proceedings. An order of deportation or of exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations or if he has departed from the United States after the issuance of the order.

The remainder of this section of Part III of this order reviews the applicability of this statute and the cases to the four groups of plaintiffs as defined in the preceding section vis a vis the plaintiffs' prayer that the Court review the exclusion orders of the class.

■ (a) As for the small first group of plaintiffs, there is no exclusion order for the Court to review. These plaintiffs have no cognizable claim at all. Since some

---

**30.** Since 8 C.F.R. § 3.6(a) provides that final orders of exclusion shall not be executed while an appeal is pending, the exclusion order of the IJ is "final" but not enforceable.

plaintiffs might be granted asylum, some plaintiffs in this group may *never* have final exclusion orders entered against them.

■ (b) The group of roughly 1,022 plaintiffs who have had final orders of exclusion entered against them by the IJ, but did not appeal those orders to the BIA, presents the most troublesome issues. It was in connection with this group that plaintiffs made their "proffer of proof" at the hearing this Court held after remand.[31] Plaintiffs offered to prove the following facts in connection with the failure of these class members to appeal. (1) All class members speak Spanish as their native language; very few have any command of English. (2) No class members were able to afford a lawyer; not even a tenth of them were represented by counsel (on a *pro bono* basis) at their exclusion hearings. (3) The overwhelming majority of the more than 1,000 plaintiffs who failed to appeal to the BIA actually had no lawyer. (4) The majority of the plaintiffs who failed to appeal to the BIA did not understand the consequences of that failure. (5) The consequences of their failure to appeal was not explained to the plaintiffs who failed to appeal. Another factor in mitigation of this group of plaintiffs' failure to appeal to

the BIA is the extremely abbreviated time frame for the taking of an appeal to the BIA from an order of exclusion, either written or oral, entered by an IJ.[32]

Plaintiffs argue that the failure of this second group to appeal to the BIA should not preclude judicial review, despite the language of 8 U.S.C. § 1105a(c). They contend that the requirement that administrative remedies be exhausted before judicial review is undertaken has two elements. The first is jurisdictional and nonwaivable: the petitioner must at a minimum have presented his or her claim to the agency. Plaintiffs maintain that those in this second group have done so, and in fact, have each presented his asylum claim to an INS District Director *and* to an IJ.[33] The second element, that *every* administrative remedy must be exhausted, is flexible and waivable, according to plaintiffs, and the statutory exhaustion requirement of 8 U.S.C. § 1105a(c) should not be enforced against these plaintiffs-in light of plaintiffs' factual proffer.[34]

Plaintiffs further argue that they should not be forced to exhaust the "motion to reopen" administrative remedy for a variety of reasons. This argument, however,

**31.** In order to actually prove what they offered to prove, plaintiffs needed to make discovery from the government of these facts pertinent to the Court's jurisdiction. Despite the language of the remand (the hearing required in this Court was to be conducted "without any discovery as to issues other than that of jurisdiction," 671 F.2d 426 at 432), the government refused to make any discovery and announced its intention to appeal any discovery order issued by this Court. The government relied on the suggestion in the concurring opinion that the task of determining whether this Court has subject matter jurisdiction "be accomplished merely by examining the allegations of the plaintiffs' complaints." *Id.* Due to the Court's resolution of the exhaustion issue, the apparent conflict between the court of appeals' opinion and the special concurrence is not addressed.

**32.** 8 C.F.R. § 236.7(b) provides:
When the applicant states that he wishes to appeal from the immigration judge's oral decision, he shall be required then and there to submit completed Form I-290A. At his request, the applicant shall be allowed 10 days from the date of the oral decision in

which to file a brief. An appeal from the immigration judge's written decision shall be taken within 13 days after mailing.

**33.** Implicit in this discussion is the assumption that the denial of asylum under 8 U.S.C. § 1253(h) is part of the final order of exclusion, reviewable by habeas corpus under 8 U.S.C. § 1105a(b), and not as a collateral immigration matter under 8 U.S.C. § 1329. *Chen Chaun-Fa v. Kiley*, 459 F.Supp. 762 (S.D.N.Y.1978). *McMullen v. Immigration and Naturalization Service*, 658 F.2d 1312 (9th Cir. 1981) stands for the same proposition *sub silentio.*

**34.** In fact, it is possible that the government does not dispute the truth of plaintiffs' proffered facts. The government's position was a simple refusal to make discovery to help plaintiffs show those facts. The Court has been extensively involved in all aspects of this litigation for ten months. From its review of various files and from its knowledge of facts developed both on the record and through discussions with counsel in chambers, the Court has no doubt the facts as proffered are true.

does not deal directly with the validity of the final orders of exclusion already entered, but rather goes to the question of the Court's jurisdiction to grant the sort of relief granted in *Coriolan v. Immigration and Naturalization Service*, 559 F.2d 993 (5th Cir. 1977).[35] In *Coriolan* the Fifth Circuit reversed an INS decision to deny asylum and remanded the case to the INS for reconsideration based on new evidence. Plaintiffs claim here that there is also new evidence, that the case should be remanded, and that exhaustion of the demonstrably inadequate motion to reopen remedy should not be required. However, the Court's jurisdiction to set aside final orders of exclusion and to remand to the INS based on new and material evidence is not invoked under 8 U.S.C. § 1105a(b), but is based on the Court's authority to grant *Coriolan* type relief, and is discussed in Part III.F. of this order, below.[36]

The government's argument that the Court lacks jurisdiction to review the final orders of exclusion entered against this group is more straightforward, and may be summarized as follows. (1) An appeal from an IJ's final order of exclusion to the BIA is an "administrative remedy available to excludable aliens as of right under the immigration laws and regulations." 8 U.S.C. § 1105a(c). (2) If an alien has not exhausted his administrative remedies, his order of exclusion *"shall not be reviewed by any court."* (3) When exhaustion is required by statute, "the exhaustion requirement is jurisdictional and the district court must dismiss the action." *Eluska v. Andrus*, 587 F.2d 996, 999 (9th Cir. 1978). (4) This principle is particularly applicable in exclusion cases: "[w]hatever the rule may be concerning deportation of persons who have

gained entry into the United States, it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the government to exclude a given alien." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543, 70 S.Ct. 309, 312, 94 L.Ed. 317 (1950). (5) Though the law in this area is "not generous," and though its application to these plaintiffs may be unfair,[37] the remedy lies with Congress. Thus runs the government's argument.

In the face of the clear language of the statute, and the very narrow authority of the courts in this area generally, this Court concludes that it lacks jurisdiction to review any orders of exclusion except those entered against plaintiffs who appealed the decision of the immigration judge to the Board of Immigration Appeals, and whose final orders of exclusion were affirmed by the BIA. *Samala v. Immigration and Naturalization Service*, 336 F.2d 7 (5th Cir. 1964); *Hernandez v. Immigration and Naturalization Service*, 539 F.2d 384 (5th Cir. 1976). Thus, this second group is not entitled to judicial review of the exclusion orders entered against them.

(c) There is no question that the third group of plaintiffs has complied with the 8 U.S.C. § 1105a(c) exhaustion requirement. Exhaustion of administrative remedies is no bar to this Court's exercise of jurisdiction to review the final exclusion orders of this group.

■ (d) While the members of the fourth group are under final órders of exclusion, they have not "exhausted" their remedies until an adverse decision is rendered by the BIA. 8 U.S.C. § 1105a(c) prevents this

---

**35.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209, (11th Cir. 1981), the new Court of Appeals, sitting *en banc*, adopted as precedent "the decisions of the United States Court of Appeals for the Fifth Circuit, as that court existed on September 30, 1981, handed down by that court prior to close of business on that date."

**36.** It is the *Coriolan* type of claim for relief which is best supported by the dictum in *Mathews v. Eldridge*, 424 U.S. 319, 331 n.11, 96 S.Ct.

893, 901 n.11, 47 L.Ed.2d 18 (1976). The applicable "core principle" is "that statutorily created finality requirements should, if possible, be construed so as not to cause crucial collateral claims to be lost and potentially irreparable injuries to be suffered...."

**37.** "Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Knauff, supra*, 338 U.S. at 544, 70 S.Ct. at 312.

Court from reviewing the orders of exclusion of those plaintiffs awaiting BIA decisions on their appeals.

3. Conclusion. In sum, 8 U.S.C. § 1105a(c) makes it clear that this Court has no jurisdiction to review any orders of exclusion (which deny asylum claims) other than orders of exclusion entered by immigration judges *and* affirmed by the Board of Immigration Appeals. Whether it is appropriate to review the final orders of exclusion of this group of approximately 150 (group (c), above) on a classwide basis is discussed in Part III.G. of this order, below.

F. Claim of Entitlement to Remand to INS for Classwide Hearing Based on New Evidence

■ 1. *Coriolan.* The primary relief sought by plaintiffs in this part of the case is the type granted by the Fifth Circuit in *Coriolan v. Immigration and Naturalization Service, supra.* In *Coriolan*, two Haitian nationals petitioned the Court of Appeals for review of final deportation orders entered against them. The Court of Appeals had jurisdiction pursuant to 8 U.S.C. § 1105a(a). *See* 28 U.S.C. § 2342. In its opinion, the Court of Appeals first critically reviewed the decisions of the immigration judges insofar as they denied petitioners' request to withhold deportation because of the risk of persecution, but then concluded that it was not necessary to decide whether those decisions amounted to abuse of discretion. *Coriolan*, 559 F.2d at 1002. Noting the Haitians' proffer of additional material relevant to their claims in the form of an Amnesty International report, the Court of Appeals reversed the INS decisions and remanded "for a reconsideration of the claims of Bonannee and Coriolan in light of the Amnesty International report." *Id.* at 1004.

The statutory basis for the Court of Appeals' remand of the case was 28 U.S.C. § 2347(c), which provides:

If a party to a proceeding to review applies to the court of appeals in which the proceeding is pending for leave to adduce additional evidence and shows to the satisfaction of the court that—

(1) the additional evidence is material; and

(2) there were reasonable grounds for failure to adduce the evidence before the agency;

the court may order the additional evidence and any counterevidence the opposite party desires to offer to be taken by the agency. The agency may modify its findings of fact, or make new findings, by reason of the additional evidence so taken, and may modify or set aside its order, and shall file in the court the additional evidence, the modified findings or new findings, and the modified order or the order setting aside the original order.

The Court of Appeals was convinced that Amnesty International's report on the general conditions in Haiti was material to the claims of the two individual Haitians. While the reasonableness of the failure to adduce the report before the INS was "more doubtful," the appellate court took· note of an affidavit that counsel for the Haitians did not have the report until after the BIA affirmed the immigration judges' decisions. "In this context, a refusal to accept the petitioners' excuse as reasonable would virtually read this remand provision out of the statute." *Id.* at 1004. As for petitioners' failure to file an administrative motion to reopen with the INS, the court commented that "[i]f failure to utilize the provisions for reopening is fatal to a claim for relief under § 2347(c), then it would seem that there could never be such relief." *Id.*

In dictum, the court indicated that it would be "remiss to launch this case on a lengthy procedural voyage" by requiring petitioners to move to reopen proceedings. It did so in light of its determination that the report was so material and so significant that a refusal to reopen would likely be an abuse of discretion, reviewable, and reversable, by the Court of Appeals. *Id.* at 1004.

2. Plaintiffs' Claim. Plaintiffs have framed their request for relief under the rationale of *Coriolan* as follows.

First, Plaintiffs suggested that the Court hear evidence and determine for itself on the merits whether Plaintiffs as a class have a well-founded fear of persecution based on membership in the Freedom Flotilla. Plaintiffs suggested that this relief was appropriate because the issue was particularly suited for class relief, class relief was not being made available administratively, and individual administrative relief on this issue was futile and inadequate.

In the alternative, Plaintiffs suggested that the Court could remand the issue of class-wide asylum to the INS with instructions to create a fair and workable administrative mechanism to handle a class-wide reopened asylum claim. As a third alternative, Plaintiffs suggested a traditional remand, for individual redeterminations on the issue of asylum based on membership in a social group.

Letter of counsel for plaintiffs to the Court, March 15, 1982, page three.[38] It is clear that what plaintiffs seek is not a review of final denials of asylum, but another chance to prove their claim of entitlement to asylum under a procedure which allows it to be proven on a classwide basis. That being the case, jurisdiction over this claim cannot lie under 8 U.S.C. § 1105a(b) or 28 U.S.C. § 2241; rather, jurisdiction lies, if at all, under 8 U.S.C. § 1329. Plaintiffs seek the opportunity to show that they have new and material evidence pertaining to the possible persecution of the Freedom Flotilla social group as a class. If they succeed in that showing, plaintiffs seek (1) a remand to the INS for a reopened, unified asylum proceeding for all plaintiffs, and particularly for those plaintiffs who have had final orders of exclusion entered against them;[39] and (2) an injunction against the return of plaintiffs to Cuba while the remand occurs.[40] An injunction would be authorized, plaintiffs claim, either by plaintiffs' prevailing on their motion for a preliminary injunction, or by the All Writs Act, 28 U.S.C. § 1651.[41] Plaintiffs also allege that they

**38.** It is apparent to the Court that plaintiffs no longer aggressively seek the first form of relief. Such relief would be inappropriate: the factual determination to be made is clearly entrusted in the first instance to the executive, with limited review available in court. This gives the agency a chance to exercise its expertise in these matters.

It is also clear that plaintiffs are not truly interested in the third alternative for relief. First, it is as unlikely that plaintiffs (who are for the most part indigent, incarcerated, unable to speak or write English and unfamiliar with the U.S. legal process) could do a better job with the new evidence, if each could get it, than they did before the District Director and the IJ. Second, this form of relief would be as administratively burdensome for all involved as the filing of individual motions to reopen. *See* discussion below. It is clear that plaintiffs primarily seek a classwide hearing on this issue.

**39.** Plaintiffs seek a *remand* under the terms of a detailed plan to be developed by the parties, but they would settle for a remand with the single direction "that the new and material evidence of persecution be considered by the agency at a unified reopened asylum hearing." Plaintiffs' post-jurisdictional hearing brief, page 15. (Plaintiffs also offer the approach of a remand in light of the Court's jurisdictional opinion, but that is only a way of doing indirectly what plaintiffs seek to do directly.)

Following the class hearing before the agency, individual hearings would then be necessary to balance the degree of persecution likely, determined on a classwide basis, against the determinations required in 8 U.S.C. § 1253(h)(2). Reopening asylum proceedings for those plaintiffs with final orders of exclusion would have the same *effect* as vacating the final orders of exclusion.

The Court assumes that plaintiffs' desire is that the determination of persecution made at the classwide INS hearing be binding on *all* plaintiffs, even those who do not have final orders of exclusion pending against them.

**40.** It is clear that a mere motion to reopen does not stay the execution of a final exclusion order. 8 C.F.R. §§ 103.5, 3.8. The government has not taken a position with respect to whether the actual reopening of proceedings stays the execution of the challenged order, although it would be logical to assume so. The Court hopes that, should it determine that plaintiffs are entitled to a remand, the government would make such a representation.

**41.** That statute provides:

(a) The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

(b) An alternative writ or rule nisi may be issued by a justice or judge of a court which has jurisdiction.

need not exhaust the administrative remedy appropriate when new and material information is discovered, since (1) the filing of individual motions to reopen would be futile in that such a remedy is wholly inadequate, and (2) "exhaustion of administrative remedies is not required when 'the question of the adequacy of the administrative remedy ... [is] for all practical purposes identical with the merits of [the plaintiff's] lawsuit.' *Gibson v. Berryhill*, 411 U.S. 564, 575, 93 S.Ct. 1689, 1696, 36 L.Ed.2d 488 (1973)." *Barry v. Barchi*, 443 U.S. 55, 63 n.10, 99 S.Ct. 2642, 2648 n.10, 61 L.Ed.2d 365 (1979). Plaintiffs also rely on the *Coriolan* dicta, that the Court would be remiss to send this case on such a long procedural voyage when to deny the motion to reopen would clearly be an abuse of discretion.

3. The Government's Response. In response, the government contends (1) that *Coriolan* was wrongly decided and lies outside the lines of established authority dealing with immigration matters; (2) that in any case, the statutory authority for the court of appeals to remand the case, 28 U.S.C. § 2347(c), which came directly from its authority to review a final order of deportation, 8 U.S.C. § 1105a(a), is not available to a district court in an exclusion case; (3) that there is in fact no jurisdictional basis for the Court to grant the relief sought by plaintiff; (4) that the motion to reopen administrative remedy is available, adequate, and must be exhausted; (5) that a classwide asylum hearing is neither permitted nor prohibited by U. S. legislation or

regulations, and thus the classwide motion to reopen should be made in the first instance to the INS to allow the agency to exercise its expertise; [42] and (6) the determinations made by the government require individual factual determinations, not classwide hearings.[43] That, in sum, is the government's response to plaintiffs' admittedly novel [44] *Coriolan* claim.

4. Futility of Exhausting Individual Administrative Remedies. Plaintiffs' claim that this Court should exercise subject matter jurisdiction, pursuant to 8 U.S.C. § 1329, over the claim that plaintiffs are entitled to a classwide remand and hearing before the INS, is compelling in many respects. The contention that the Court should cut through the administrative forms and go to the substance of the dispute, as in *Coriolan*,[45] is supported by the futility and impossibility of exhausting the appropriate administrative remedies on an individual basis. It should be noted also that the statutory exhaustion requirement of 8 U.S.C. § 1105a(c) is not applicable; thus, if subject matter jurisdiction were to lie under 8 U.S.C. § 1329, the ordinary, more flexible principles of the judicial exhaustion requirements would apply.

The administrative remedy available here—individual motions to reopen—is hopelessly inadequate. It is Hornbook law that administrative remedies need not be exhausted

> when the prescribed administrative remedy is plainly inadequate because either no

---

**42.** The denial of a motion to reopen is reviewable by the courts, *Hernandez v. Immigration and Naturalization Service*, 539 F.2d 384, 386 (5th Cir. 1976). *See* discussion in Part III.F(6) of this order, *infra*.

**43.** For discussion of the propriety of classwide relief, see Part III.G of this order, below.

**44.** The only certainty in this unprecedented class action—other than the unvarying excellence of counsel for both sides—has been the regularity with which novel issues have arisen. *See* order of August 7, 1981, 91 F.R.D. 117 (class action habeas corpus certified); order of September 10, 1981, 521 F.Supp. 446 (motion by State of Florida to intervene as party-defendant in habeas case denied); order of October 2, 1981 (Secretary of Department of Health

and Human Services and Director of Office of Refugee Resettlement joined as parties defendant pursuant to Fed.R.Civ.P. 19(a)(1)); and order of November 4, 1981 (government appeal of an order denominated "temporary restraining order").

The novelty of plaintiffs' claim is further shown by comparison with *Haitian Refugee Center v. Civiletti, supra*. Plaintiffs here seek a *classwide* administrative hearing; the Haitian plaintiffs in Florida seek more thorough *individual* hearings on their asylum claims.

**45.** The government's contention that *Coriolan* was not correctly decided need not be discussed. Appellate court decisions bind district courts within the circuit.

remedy is available, the available remedy will not give relief commensurate with the claim, or the remedy would be so unreasonably delayed as to create a serious risk of irreparable injury.

*Patsy v. Florida International University*, 634 F.2d 900, 903 (5th Cir. 1981) (en banc), *cert. granted*, —— U.S. ——, 102 S.Ct. 88, 70 L.Ed.2d 81 (1981). The court in *Patsy* elaborated on what it meant by "adequate" and "appropriate" remedies in the context of an action under 42 U.S.C. § 1983.

> *First,* an orderly system of review or appeal must be provided by statute or written agency rule. *Second,* the agency must be able to grant relief more or less commensurate with the claim. *Third,* relief must be available within a reasonable period of time. *Fourth,* the procedures must be fair, and not unduly burdensome, and must not be used to harass or otherwise discourage those with legitimate claims. *Fifth,* interim relief must be available, in appropriate cases, to prevent irreparable injury and to preserve the litigant's rights under section 1983 until the administrative process has been concluded.

*Patsy, supra,* 634 F.2d at 912–13. The individual motion to reopen remedy clearly fails the second, fourth and fifth tests under *Patsy.*

(a) Second test. While the INS is "able to grant relief more or less commensurate with the claim," individual motions to reopen could not result in a grant of such relief. Motions to reopen filed by each class member would be tantamount to conceding the issue whether a hearing should be held on a classwide basis in favor of the government.

(b) Fourth test. It is obvious that the administrative procedures presently in use are hopelessly inadequate to deal with the claims of the plaintiffs. Both the Attorney General and Ms. Doris Meissner, Commissioner, Immigration and Naturalization Service, in their statements before Congressional subcommittees, recognized the deficiencies in the system. Attorney General William French Smith, noting the vast increase in asylum applications caused, in large measure, by the influx of Cubans and Haitians, testified that "[i]n the face of these circumstances, our policies and procedures for dealing with asylum applicants, which have been generous and deliberate, have crumbled under the burden of overwhelming numbers." Administration's Proposals on Immigration and Refugee Policy: Joint Hearing before the Subcommittee on Immigration, Refugees and International Law of the House Committee on the Judiciary, and the Subcommittee on Immigration and Refugee Policy of the Senate Committee on the Judiciary, 97th Congress, 1st Session 75 (July 30, 1981). INS Commissioner Doris M. Meissner has likewise stated, "[b]ecause we have suddenly become a country of first asylum, our policies and procedures, which have been generous and deliberate, have proved inadequate to deal with these overwhelming numbers." United States as a Country of Mass First Asylum: Hearing before the Subcommittee on Immigration and Refugee Policy of the Senate Committee on the Judiciary, 97th Congress, 1st Session 16 (July 31, 1981). Counsel for the government conceded that there was "some confusion" regarding administrative procedures for motions to reopen. To expect compliance with these confusing regulations by these plaintiffs is unrealistic. Plaintiffs are virtually all (a) incarcerated, (b) indigent, (c) unable to speak or write English, (d) unrepresented by counsel, and (e) unfamiliar with American legal proceedings. It would be difficult to find a group of people less likely to be able to assert their rights, and exhaust their theoretically available administrative motion to reopen remedy, than plaintiffs.

Aside from problems not of the government's making, there are uncertainties in the regulations which might create additional burdens for plaintiffs. It is not clear, for example, whether the INS would give consideration to motions to reopen filed in Spanish. Some plaintiffs would have to file their motions (in duplicate) with "the district director in whose district the proceeding was conducted for transmittal to the

officer having jurisdiction." 8 C.F.R. § 103.5. That would require plaintiffs to file their motions to reopen with different INS district directors all over the country for transmittal to appropriate IJ's.[46] Other plaintiffs would have to file their motions to reopen (in triplicate) with the BIA. 8 C.F.R. § 3.8. There is the additional question whether the INS would accept the same additional evidence supporting over 1,000 motions to reopen, assuming for the moment the unlikely proposition that each plaintiff could fully marshal the information for presentation.

(c) Fifth test. The regulations specifically provide that interim relief is not available to prevent threatened irreparable injury and to preserve plaintiffs' rights in the meantime. 8 C.F.R. §§ 3.8, 103.5.

Further, requiring each plaintiff to exhaust the individual motion to reopen remedy would be wholly counter to plaintiffs' claim of entitlement to a *single* classwide hearing on the persecution issue. Since the "question of the adequacy of the administrative remedy," which does not specifically provide for a classwide hearing, is "for all practical purposes identical with the merits" of plaintiff class' lawsuit, *Gibson v. Berryhill, supra,* 411 U.S. at 575, 93 S.Ct. at 1696, the individual motion to reopen remedy should not have to be exhausted.

5. Merits of Plaintiffs' Claim. A year after plaintiffs arrived here and shortly after this case was transferred to Atlanta from Kansas, counsel for plaintiffs learned of the mistreatment of certain "Freedom Flotilla" or "Marielito" Cubans who returned to Cuba. The returnees were imprisoned without a trial and without notice to family, mistreated, tortured in some cases, and then cast adrift in the Caribbean between Cuba and Florida. Attached as exhibits to plaintiffs' July 8, 1981 motion to amend are the affidavits of some of the survivors of this ordeal. Based on this information and on facts that plaintiffs sought to develop from government and non-government experts on Cuban internal affairs, plaintiffs sought relief in this Court. *Coriolan* is authority for the proposition that such information may be regarded as material for each class member. Since the facts to be proved concerning persecution would be the same for each plaintiff, the most sensible, efficient thing to do would be to have a classwide hearing on the persecution issue,[47] followed by individual hearings to determine whether the plaintiff fell into any of the categories of 8 U.S.C. § 1253(h)(2). The right to file individual motions to reopen is meaningless here as the present procedures are totally inadequate to vindicate the claims of plaintiffs.

There is little doubt that plaintiffs' affidavits represent information both "new" and material. Further, this information is supported in part by the government's own *Country Reports on Human Rights Practices for 1981,* pages 396–406, (Department of State, February, 1982). The facts here demand the type of relief granted by the Court of Appeals in *Coriolan.*

6. Lack of Jurisdiction. Despite the fundamental merit of plaintiffs' claim for relief and the inadequacy of the administrative procedures, this Court reluctantly concludes that it lacks subject matter jurisdiction to remand to the INS for a classwide hearing.

**46.** Aside from the administrative burdens created by over 1,000 motions to reopen—each based, in large part, on the same newly-discovered evidence—such a procedure would "create a risk of (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class . . . ." Fed.R.Civ.P. 23(b)(1).

**47.** To make out a claim of threatened persecution, an alien must show, first, that harm of a certain severity is threatened and, second, that it is reasonably likely to occur. He must also show that his home government is directly or indirectly responsible for the threatened harm and, finally, that the harm is threatened for reasons recognized by the Protocol and statutes as grounds for a grant of asylum.
Note, The Right of Asylum Under United States Law, 80 *Colum.L.Rev.* 1125, 1134 (1980). Each of these four showings could be made in a single classwide hearing. *See* discussion in text at n.51, *infra.*

First, in its jurisdictional aspects, *Coriolan* is entirely distinguishable from this case. In *Coriolan*, the Court of Appeals had jurisdiction to review petitioners' final deportation orders under the explicit provision of 8 U.S.C. § 1105a(a). That jurisdictional provision explains that the procedure prescribed by 28 U.S.C. § 2341 et seq. shall apply to judicial review of final deportation orders. 28 U.S.C. § 2347(c) provides a procedure for a court of appeals to remand a case to the agency when a party to judicial review applies for a remand and shows the court that there is additional, material evidence and that there were reasonable grounds for the party's failure to produce the evidence before the agency. The Court of Appeals in *Coriolan* appropriately remanded the case to the agency under a clear grant of jurisdiction. This Court, however, has no jurisdiction pursuant to 8 U.S.C. § 1105a(a). Even if the Court had jurisdiction pursuant to 8 U.S.C. § 1105a(b), there is no remand provision parallel to 28 U.S.C. § 2347(c) for district courts reviewing final exclusion orders.

Second, 8 U.S.C. § 1329, a very general grant of jurisdiction, will not support the exercise of jurisdiction here. Plaintiffs' claim does not truly "arise under" Title II of the Immigration and Nationality Act; certainly there is no case law to support that proposition. In addition, the Court is reluctant to exercise jurisdiction over a classwide claim in an area of the law (judicial review of the claims of excludable aliens) where the Court's jurisdiction is so severely limited. Another point counsels the Court against exercising any jurisdiction over this claim under the provisions of 8 U.S.C. § 1329 or any other general grant of jurisdiction. The relief sought by plaintiffs—a classwide hearing—is closely related to their exclusion proceedings, and the denial of the claim for a classwide hearing may fairly be said to "merge" with final orders of exclusion. *Louis v. Meissner*, 532

F.Supp. 881, 888 (S.D.Fla.1982). Those orders, of course, are reviewable, 8 U.S.C. § 1105a(b), as are orders denying motions to reopen. *See, e.g., Hernandez v. Immigration and Naturalization Service*, 539 F.2d 384 (5th Cir. 1976). There being no final order of exclusion denying plaintiffs' claim for a classwide hearing, there is nothing for the Court to review.

Finally, and most important, it is apparent that (1) no individual plaintiff has yet filed a motion to reopen, whether on his own behalf or on behalf of the class; and (2) no classwide motion to reopen has been attempted. The Court acknowledges the practical problems involved in such an endeavor; however, in a real sense, plaintiffs' claim that they are entitled to a classwide hearing has never been presented, nor has there been an attempt to present the claim, to the administrative body for a decision. Thus, plaintiffs have not met the nonwaivable, jurisdictional requirement for judicial review of administrative action. *Mathews v. Eldridge*, 424 U.S. 319, 328, 96 S.Ct. 893, 899, 47 L.Ed.2d 18 (1976). Thus, even if jurisdiction over the claim might be properly based on 8 U.S.C. § 1329, the Court would decline to review the matter until the claim had been at least presented to the administrative body.

At oral argument before this Court, counsel for the government invited plaintiffs to present their claim to the agency.[48] While such a claim would be difficult if filed according to the regulations, plaintiffs may wish to consider presenting their claim directly to the Attorney General, the Board of Immigration Appeals, or the INS Commissioner, or to all of these entities.

The Attorney General has broad authority under the Immigration and Nationality Act. 8 U.S.C. § 1103.

> He shall have control, direction, and supervision of all employees and of all the files and records of the Service. He shall

---

48. MR. FROMSTEIN:

There is nothing to preclude [plaintiffs] from going to an Immigration Judge and asking the Immigration Judge [to] hear a motion to reopen file on 100 aliens.... [Plaintiffs] can

go back to the Board and ask the Board to consider the 580 cases that they have before it and they can file one motion to reopen saying they want the Board to consider as a class all these 580 cases.

establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such intructions [instructions]; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this Act. He is authorized, in accordance with the civil-service laws and regulations and the Classification Act of 1949, to appoint such employees of the Service as he deems necessary, and to delegate to them or to any officer or employee of the Department of Justice in his discretion any of the duties and powers imposed upon him in this Act; he may require or authorize any employee of the Service or the Department of Justice to perform or exercise any of the powers, privileges, or duties conferred or imposed by this Act or regulations issued thereunder upon any other employee of the Service.

*Id.* The Attorney General has delegated much authority to the Commissioner of the Immigration and Naturalization Service, and to the Board of Immigration Appeals. 8 C.F.R. §§ 2.1, 3.1. The Commissioner has the authority to direct the administration of the INS and to enforce the Act and regulations. Further, the Commissioner "may issue regulations as deemed necessary or appropriate for the exercise of any authority delegated to him by the Attorney General, and may redelegate any such authority to any other officer or employee of the Service." 8 C.F.R. § 2.1. Plaintiffs may wish to petition the Commissioner for a regulation permitting classwide hearings.[49]

The Board of Immigration Appeals has "so much of the Attorney General's power and authority under the immigration and nationality laws as he may delegate to it." 8 C.F.R. § 3.1(a)(1). The BIA performs "the quasi-judicial function of adjudicating cases coming before the Board." 8 C.F.R. § 3.1.(a)(3). In addition to the BIA's ordinary appellate jurisdiction, 8 C.F.R. § 3.1(b) and its jurisdiction by certification, 8 C.F.R. § 3.1(c), the BIA has additional, more general powers to which plaintiffs' claim might be directed.

(d) *Powers of the Board* —

(1) *Generally.* Subject to any specific limitation prescribed by this chapter, in considering and determining cases before it as provided in this part, the Board shall exercise such discretion and authority conferred upon the Attorney General by law as is appropriate and necessary for the disposition of the case.

8 C.F.R. § 3.1(d). The Board has the power to "return a case to the Service for such further action as may be appropriate, without entering a final decision on the merits of the case." 8 C.F.R. § 3.1(d)(2). Either the Board itself or the Attorney General may decide that the question, whether a requested classwide persecution hearing before the agency is appropriate, is sufficiently important that the question should be referred to the Attorney General himself for review of the Board's decision. 8 C.F.R. § 3.1(h)(1). In any case, until one of these avenues, or some other avenue, has been pursued by plaintiffs in an attempt to present their claim to the agency, this Court lacks subject matter jurisdiction over plaintiffs' claim of entitlement to a classwide hearing. The question *must* be decided, as an initial matter, by the agency.

G. Propriety of Classwide Review of Final, Exhausted Exclusion Orders

██ Since the Court has determined that it has subject matter jurisdiction over final,

---

**49.** While refugee status must normally be determined on an individual basis, situations have also arisen in which entire groups have been displaced under circumstances indicating that members of the group could be considered individually as refugees. In such situations the need to provide assistance is often extremely urgent and it may not be possible for purely practical reasons to carry out an individual determination of refugee status for each member of the group. Recourse has therefore been had to so-called "group determination" of refugee status, whereby each member of the group is regarded *prima facie* (i.e. in the absence of evidence to the contrary) as a refugee.
*Handbook on Procedures and Criteria for Determining Refugee Status* (Office of the United Nations High Commissioner for Refugees, 1979), page 19, ¶ 44. An opinion by the Office of Legal Counsel of the Attorney General indicates that "it is appropriate to consider the guidelines in the Handbook as an aid to construction of the [Refugee Act of 1980]."

administratively exhausted orders of exclusion, it is appropriate, in light of the contentions of the government, to treat the issue whether these claims are maintainable as class actions.[50] In doing so, the Court recognizes that Fed.R.Civ.P. 23 " 'should be given a liberal rather than a restrictive interpretation' and that 'if there is to be an error made, let it be in favor and not against the maintenance of the class action.' " 7 *Wright and Miller, Federal Practice and Procedure*, § 1753, page 541 (1972) (citations omitted).

In certifying this action as a class action, *see* order of the Court dated August 7, 1981, 91 F.R.D. 117, the Court carefully reviewed the four prerequisites of Rule 23(a) and found them to be present. The Court also found that the government "has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). For the most part, the discussion in the August 7, 1981 order also pertains to the issue whether the claims asserted here are maintainable as a class action.

As previously noted, there is little precedent for this action. However, Rule 23 has been thought to be a device sufficiently supple for use in a number of cases involving immigration matters. In *Nguyen Da Yen v. Kissinger*, 528 F.2d 1194 (9th Cir. 1975), the court of appeals affirmed a preliminary injunction in which the district court exercised jurisdiction over the claims of a class of "babylifted" Vietnamese children and reviewed the Attorney General's parole decisions under 8 U.S.C. § 1182(d)(5).[51] In *Silva v. Bell*, 605 F.2d

978 (7th Cir. 1979), the court of appeals reversed and remanded with the direction that the district court implement a visa recapture program granting relief to plaintiff class of certain nonresident Western Hemisphere visa applicants, due to a prior error in the visa program.

In other cases, relief has been sought, not under our immigration laws but under other U. S. legislation, on behalf of plaintiff classes defining themselves in terms of their immigration status. *See Narenji v. Civiletti*, 481 F.Supp. 1132 (D.D.C.1979) (declaratory and injunctive relief granted plaintiff class of Iranian students against special reporting regulation on Fifth Amendment equal protection ground), *rev'd on substantive grounds*, 617 F.2d 745 (D.C. Cir.1979) (*en banc*), *cert den. sub nom. Confederation of Iranian Students v. Civiletti*, 446 U.S. 957, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980). *See also Phan v. Friedes*, 91 F.R.D. 408 (N.D.Ill.1981);[52] *Moreno v. University of Maryland*, 420 F.Supp. 541 (D.Md.1976), *aff'd without op.*, 556 F.2d 573 (4th Cir. 1977), *vacated and remanded for reconsideration sub nom. Toll v. Moreno*, 441 U.S. 458, 99 S.Ct. 2044, 60 L.Ed.2d 354 (1979); and *In re Alien Children Education Litigation*, 501 F.Supp. 544 (S.D.Tex.1981), *cert. granted*, 452 U.S., 937, 101 S.Ct. 3078, 69 L.Ed.2d 950 (1981).

The most important case involving class certification of claims for relief from immigration decisions is *Haitian Refugee Center v. Civiletti*, 503 F.Supp. 442 (S.D.Fla.1980) (appeal pending). While the lengthy published order of Judge King does not contain his class certification rationale, it is clear that facts similar to those extant in this case, such as plaintiffs' indigency, incarcer-

---

**50.** "Rule 82 makes it clear that Rule 23 cannot be construed to broaden or limit the subject matter jurisdiction of the district courts. Thus, a class action can be maintained only if it complies with the requirements of the jurisdictional statute under which it is brought." 7 *Wright and Miller, Federal Practice and Procedure* § 1755, pages 547–48 (1972) (citations omitted).

**51.** *But see Nguyen Da Yen v. Kissinger*, 70 F.R.D. 656 (N.D.Cal.1976) (class subsequently

decertified for plaintiffs' failure to sustain their burden of showing that Rule 23 requirements were met), *appeal dismissed for mootness*, 602 F.2d 925 (9th Cir. 1979).

**52.** In *Phan*, a class of parolee refugee students granted relief from discrimination in the giving of scholarships was redefined to bring the class definition in line with the newly-passed Refugee Act of 1980.

ation, and inability to speak English, weighed in favor of certification. *See also Louis v. Meissner, supra.*

While it is difficult for a court to review a large number of final orders of exclusion on a classwide basis, whatever the appropriate standard of review, due to the factual inquiry which should be conducted for each class member, such a review proved possible in the *Haitian Refugee Center* case. Further, in the habeas portion of this action in which a similar argument was made, it was possible to define a subclass in such a way as to make it clear that there had been an abuse of the parole discretion as to anyone falling within that subclass. *See* order of August 20, 1981, 91 F.R.D. 239, 242–43. The Court has not yet heard any evidence as to plaintiffs' claims that their final, BIA-affirmed orders of exclusion ought to be set aside, and it may be that this group of plaintiffs will abandon this claim if the agency permits a classwide asylum hearing. In any event, however, this Court concludes that this issue is appropriate for Rule 23 treatment.

## IV. Proceedings Contemplated After Appeal

Should the Court of Appeals sustain this Court's view of its jurisdiction, the Court anticipates the following proceedings on remand. First, as to those plaintiffs who have had final orders of exclusion entered against them and affirmed by the BIA, the Court anticipates a classwide hearing at which the burden will be on the plaintiffs to show why, as a group and not on individual grounds, the final orders of exclusion should be set aside.[53] Second, the Court would also anticipate entering an order dismissing those portions of the complaint over which it has no jurisdiction. The Court anticipates deferring the class review of final, exhausted exclusion orders pending a resolution of the question whether the *agency* will conduct a classwide hearing on the new and material evidence for all plaintiffs.

## V. The Injunction

■ In its order of remand, the Court of Appeals realized, as this Court has from the beginning, the importance of this litigation.[54] The court treated the government's appeal as a petition for a writ of mandamus, remanded the case to this Court with directions, and required this Court to certify the question of subject matter jurisdiction for interlocutory appeal upon request by any party. In exercising its own discretionary powers under the All Writs Act, 28 U.S.C. § 1651(a), the Court of Appeals indicated its wish "to supervise the judicial administration of this case and to prevent the defeat of appellate review." 671 F.2d 426 at page 431.

At the hearing before this Court upon remand, this Court asked the parties to address the question whether it ought to continue the injunction entered on August 19, 1981 pending resolution of the second appeal. Were the Court to dissolve the injunction, the government would be free to execute the final orders of exclusion against many of the plaintiffs. This would render moot some of the issues raised in this case and "defeat appellate review" as effectively as this Court's failure to decide the question of its subject matter jurisdiction. Accordingly, this Court will CONTINUE the injunction in effect. It will also STAY all further proceedings in this portion of the case pending resolution of the appeal. 28 U.S.C. § 1292(b). Rulings on the government's motion to dissolve the injunction and on plaintiffs' motion for a preliminary injunction are hereby DEFERRED pending the results of the appeal.

Had the Court of Appeals not indicated its desire to supervise the administration of this case, this Court would still continue the

---

**53.** Should no classwide basis for review or reversal of the exclusion orders appear, decertification of the class as to this issue, or partial judgment for defendants, might be appropriate.

**54.** *See* 671 F.2d 426 at page 431 (this action presents a "novel controvers[y] requiring a determination of the rights of illegal aliens and

the scope of the constitutional powers of Congress and the President to conduct foreign affairs .... [W]e believe that this case presents the truly 'rare' situation in which it is appropriate for this court to require certification of a controlling issue of national significance.").

injunction in effect pending appeal. The harm threatened in this case, if plaintiffs' allegations are correct—imprisonment, torture, death—is so severe, so truly irreparable, that the harm threatened in other civil actions pales in comparison.

## VI. Certification for Interlocutory Appeal

Counsel for the government stated at the hearing before this Court that the government would appeal any ruling adverse to its position. In order to hasten proceedings, the Court will treat this representation as a request for an interlocutory appeal. Accordingly, being of the opinion that this order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of this litigation, the Court hereby CERTIFIES the question of its subject matter jurisdiction for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). 671 F.2d 426 at page 432.

## CONCLUSION

Plaintiffs' plight calls for *someone* to do *something*. Yet there is an unbroken line of cases indicating that the role of the federal courts in immigration cases is to be minimal,[55] even when the alien is incarcerated, when the alien is excludable. Even with respect to refugee claims, immigration law is not generous;[56] the remedy for any unfairness, it is said, lies with Congress and the President. However, for 14 months the government failed to even begin to imple-

ment a program to determine which of 2,000 Cuban detainees really ought to have been in a maximum security prison. The Court agrees with the government that the problems created by the Freedom Flotilla should be handled by Congress and the President. But in the absence of *action* from the other branches, *and* to the extent that its jurisdiction is properly invoked, this Court has heard and decided plaintiffs' claims and will continue to do so, it is hoped, on a rational and responsible basis.

In sum, plaintiffs' motion to amend their complaint is GRANTED. The Court CONCLUDES that it has jurisdiction over the habeas corpus portion of the case as set out in Part I of this order. The Court DETERMINES that it has jurisdiction on a classwide basis to review by way of habeas corpus, 8 U.S.C. § 1105a(b), those final orders of exclusion entered against certain plaintiffs by the BIA, but also DETERMINES that it lacks subject matter jurisdiction to review final orders of exclusion not appealed to the BIA and final orders of exclusion entered by immigration judges which are presently on appeal before the BIA, and that it lacks jurisdiction at this time over plaintiffs' claim of entitlement to a remand to the INS for a classwide hearing. The Court CONTINUES in effect the injunction entered on August 19, 1981. Rulings on the government's motion to dissolve the injunction and on plaintiffs' motion for a preliminary injunction are hereby DEFERRED pending appeal. Finally, the

**55.** "There is no area of law in which Congress has more unreviewable power than in immigration and naturalization matters." *Haitian Refugee Center, supra,* 503 F.Supp. at 452.

**56.** *Coriolan, supra,* 559 F.2d at 996. *But see* Note, The Right of Asylum under United States Law, 80 *Colum.L.Rev.* 1125 (1980). The author of the Note concludes his review of the Protocol and U.S. domestic legislation, including the Refugee Act of 1980, as follows:

This country's adherence in 1968 to the United Nations Protocol Regarding the Status of Refugees brought about a number of significant changes—some not fully appreciated at the time—in United States asylum law. Most important, the Protocol created a right of asylum for qualified claimants. It made mandatory, with limited exceptions,

the protection of refugees unwilling or unable to return to their native country because of a well-founded fear that their lives or freedom would be threatened on account of race, religion, nationality, membership in a social group, or political opinion.

Not all of the reforms mandated by the Protocol have been implemented, and courts and administrators have yet to develop standards of eligibility sufficiently clear to assure that full effect is given to this asylum right. Congress's adoption of the Refugee Act of 1980, integrating the Protocol's substantive provisions into domestic statutory law, should provide encouragement for a more expansive regime of asylum.

80 *Colum.L.Rev.* at 1148.

Court, being of the opinion that this order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal may materially advance the ultimate termination of this litigation, CERTIFIES the question of its subject matter jurisdiction for an immediate interlocutory appeal, *see* 28 U.S.C. § 1292(b), 671 F.2d 426 at page 432, and further STAYS all proceedings on this aspect of the case pending a resolution of the appeal.